**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 06-20624-CIV-GOLD/McALILEY**

**PYCSA PANAMA, S.A.,**

      Plaintiff,

v.

**TENSAR EARTH TECHNOLOGIES, INC.,**

      Defendant.

_____/

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; ADMINISTRATIVELY CLOSING CASE

**THIS CAUSE** is before the Court on Defendant's Motion for Summary Judgment [DE 260], filed October 10, 2007.  The parties have filed a Response [DE 293], a Reply [DE 307], and individual statements of undisputed facts [DE 276, 287, 308, & 309].  In addition, since this case involves issues which may be governed by Panamanian law, the parties have submitted affidavits of their respective Panamanian Law Experts.  On January 8, 2008, I held an evidentiary hearing pursuant to Federal Rule of Civil Procedure 44.1 to resolve disputed issues raised by the competing affidavits.  Following oral argument on the subject motion, which was held on January 18, 2008, the parties filed supplemental briefs [DE 338, 364], affidavits [DE 344] and other supporting documents [DE 343, 345, 346].  Having reviewed the record, the parties' arguments and the relevant case law, I conclude that Defendant's Motion for Summary Judgement should be granted as to all counts of Plaintiff's complaint.

1

## I.  Factual Background

**A.     Undisputed Facts**

The following material facts are undisputed and supported by evidence in the record:[1]

1. Plaintiff Pycsa Panama, S.A. ("Pycsa") is a Panamanian entity headquartered in Panama City, Panama.  (Defendant's Statement of Undisputed Facts, DE 276 at p. 1; Jan. 18, 2008 Hr'g Tr.).[2]

2. Pycsa has two corporate sisters: Constructora Vial ("Vial") and Autovias BS ("Autovias").  (*Id.*).

3. The three corporate sisters exist under the laws of Panama, and share an office in Downtown Panama City.  (*Id.*).  The companies exist solely to build and operate the Panama tollway project: Pycsa acts as the concessionaire, Vial acts as the general contractor, and Autovias operates the completed portions of the tollway.  (Defendant's

---

[1] In the Southern District of Florida, a party moving for summary judgment must submit a statement of undisputed facts.  *See*  S.D. Fla. L.R. 7.5.  If necessary, the non-moving party may file a concise statement of the material facts as to which it is contended there exists a genuine issue to be tried.  *Id.*  Each disputed and undisputed fact must be supported by specific evidence in the record, such as depositions, answers to interrogatories, admissions, and affidavits on file with the Court.  *Id.*  All facts set forth in the movant's statement which are supported by evidence in the record are deemed admitted unless controverted by the non-moving party.  *Id.*

[2] At the Jan. 18, 2008 hearing on the subject motion, the Court and the parties engaged in a discussion of the undisputed facts of the case.  During that discussion, the parties admitted a number of facts that are not otherwise disputed in the record.  For simplicity purposes, I shall cite to the hearing transcript in support of facts admitted by the parties which are not otherwise disputed by the record evidence.  On the other hand, in the case of undisputed key facts, I shall cite to both the hearing transcript and the portions of the record supporting such facts.

Statement of Undisputed Facts, DE 276 at p. 3, & n. 7).

4. Pycsa International, a Cayman-incorporated company, acts as a holding company for the three corporate sisters.  (*Id.* at n. 1).  Grupo Pycsa, a Mexican corporation, is the corporate parent.  (*Id.* at p. 1).

5. Defendant Tensar Earth Technologies, Inc.[3] ("Tensar") is a corporation existing under the laws of the State of Georgia, with its principal place of business in Atlanta, Georgia. (Compl. at ¶ 3; Answer at ¶ 2; DE 267 at p. 8, & n. 14).  Tensar has been registered to conduct business in Florida since 1997, and its products have been used on projects throughout the State of Florida.  (*Id.*).

6. Tensar holds the worldwide patents for the Mesa mechanically structured earth retention systems or retaining walls ("Mesa Wall System" or "Mesa Walls"), and the Tensar Geogrid.[4]  (DE 276 at p. 8).

7. Tensar sells its products and retaining wall system through an international network of distributors and licensees.  *Id.*

8. Fundaciones, S.A. ("Funsa") is a Panamanian construction company devoted to the design and construction of foundations, geotechnical work, various kinds of pillars, walls, erosion control, bridge construction, and deep well digging.  (DE 276 at p. 7).

9. Funsa has been in business since 1972, and does 99% of its work is in Panama.  (*Id.* at p. 7, & n. 11).  It has also done work in Costa Rica and the Dominican Republic.  (*Id.*).

---

[3]

Since the filing of this litigation, Defendant has changed its name from Tensar Earth Technologies, Inc. to Tensar International Corporation.

[4]

Geogrids are a component of the Mesa Wall System; they are also called "Geomesh."

B.     **The Mesa Wall System**

10. The Mesa Wall System, designed by Tensar, has several components: blocks, geogrids, connectors, and soil. (Compl. at ¶; Defendant's Motion for Summary Judgement, DE 277 at p. 8).[5]  Tensar manufactures, in Georgia, the "geogrids" utilized in the construction of the Mesa Wall System.  (DE 276 at p. 8).

11.  The "block" is the structure used to build the Mesa Wall System.  (Jan. 18, 2008 Hr'g Tr.).  The top layer of the block is called the "cap."  (*Id.*).

12.     The blocks used in the bridge abutments at issue in this case were manufactured by a non-party Panamanian company, Multiblock, S.A. ("Multiblock"), in Panama, and purchased by Vial and Pycsa directly from Multiblock, in Panama. (DE 330; Jan. 18, 2008 Hr'g Tr.).

13. To manufacture the blocks, Multiblock used a mold Funsa had previously

---

[5]

In its Response to Tensar's Statement of Undisputed Material Facts [DE 287], Pycsa did not dispute the accuracy of this statement.  However, during the Jan. 18, 2008 hearing, Pycsa argued that the fourth component is not soil, but rather it is "engineering and construction services." (Jan. 18, 2008 Hr'g Tr.).  A review of the record indicates that Pycsa is relying on a print-out of Tensar's website, DE 292-6, in which "Full Engineering and Construction Services" is listed under the heading of "Mesa Systems' Component." According to the web-page, the "function" of this component is "Detailing, design, construction services, site assistance, drawings and construction installation *available for each Mesa project **upon request**.*" (emphasis added).  Pycsa has submitted no record evidence to establish that it requested these services from Tensar; therefore, even if engineering and construction services is, at times, a component of the Mesa Wall System, there is no record evidence that it was a component of the Mesa Wall Systems at issue in this case.  In addition, as further explained below, the undisputed record evidence is that Vial contracted with Funsa for the construction of the subject bridge abutments, "[a]s well as to provide the supervision, labor, tools, materials and equipment necessary for the proper execution of all jobs," (Funsa/Vial Professional Services Contract, DE 278 at Ex. U); neither Pycsa nor Vial contracted Tensar for rendering, engineering or construction services.  Moreover, other portions of the record indicate that "soil" is a component of the Mesa Wall System, and Pycsa admits that soil is used in connection with the Mesa Wall System.  It is also undisputed that the soil in this case came from Panama.

purchased from Tensar.  (Jan. 18, 2008 Hr'g Tr.).  The mold had been designed by Tensar and Pronique, a Canadian Company.  (*Id.*). Tensar bought the mold and used it in connection with unrelated projects in Florida. (*Id.*).

14. In 1996, Funsa bought the mold from Tensar.  (*Id.*).

15.  Funsa and Multiblock used this mold in Panama to manufacture the blocks that were used in connection with the Mesa Wall at issue.[6]  (*Id.*).

16. At the time the mold was designed by Tensar and Pronique, the current dual system of "standard" and "high performance" Tensar blocks and connectors had not been developed.  (*Id.*).  This mold, which the parties agree was used to manufacture the blocks used in the subject bridge abutments, was originally designed to create a block that does not fit the current description of either a "standard" or a "high performance" block – the parties have referred to these blocks as "hybrid blocks."  (Jan. 18, 2008 Hr'g Tr.).

17.  The "geogrids" are manufactured by Tensar in a manufacturing plant located in Georgia.  (Jan. 18, 2008 Hr'g Tr.).  I infer in Plaintiff's favor for purposes of summary judgment that Tensar designed the geogrids in Georgia.

18.  The "connectors" are manufactured by third parties in various locations, including Canada.  (Jan. 18, 2008 Hr'g Tr.).  Post-manufacture, the connectors are sent to Tensar in Georgia.  (*Id.*).  Tensar sells the connectors, from Georgia, as its product.  (*Id.*).  It is unknown who designed the connectors, although for summary judgment

---

[6]

There is only one Purchase Order, dated November 2, 2002, from Vial directly to Multiblock for the purchase of the blocks. (DE 330 at Ex. G).  In it, Vial indicated: "The Blocks must adhere to the quality and specifications attached to this order."  Attached to the Order was a print out of a "MESA HIGH PERFORMANCE UNIT", sent to Eduardo Abed, Engineer and Construction Director for Vial , by Funsa.  (*Id.*).

purposes, I infer that Tensar designed the connectors in Georgia, including the more recent dual system of standard and high performance connectors.

19. The Mesa Wall System, as a whole, was designed by Tensar in Georgia. (License Agreement, DE 278 at Ex. T).

**C.    The Funsa-Tensar Agreements**

20. Funsa first interacted with Tensar in the early 1980s when Funsa purchased Tensar geogrids for an unrelated sanitary landfill project.  (DE 278 at n. 15).

21. On August 3, 1995, Funsa and Tensar entered into an exclusive Product Distribution Agreement giving Funsa the right to promote and sell Tensar's products in Panama.  (*Id.* at p. 8).[7]

22 Under the terms of the Distribution Agreement, Tensar agreed to provide Funsa – at Tensar's sole discretion – with reasonable product management, sales administration, marketing materials, customer service and training support.  (DE 276 at p. 8; DE 278 Ex. S at ¶ 6).  The training would be provided at Tensar's home offices in Atlanta, Georgia. (*Id.*).

23.   Relevant parts of the Distribution Agreement provide that: (1) nothing in the agreement shall make Funsa an agent, representative or partner of Tensar; (2) nothing in the agreement shall create any liability of Tensar to, or privity of Tensar with, any customers of Funsa or its partners; and, (3) the agreement is governed by the laws of the State of Georgia, and the parties agree to personal jurisdiction in Georgia.  (*Id.* at Ex. S at ¶¶ 10.1, 10.2, & 10.3).

---

[7]

A copy of the "Product Distribution Agreement" has been filed with the Court.  (*See* DE 278 at Ex. S).

24.   On August 18, 1995, Funsa and Tensar executed a separate licensing agreement. (License Agreement, DE 278 at Ex. T).   The licensing agreement acknowledges that Tensar has developed a proprietary concrete modular block retaining wall system consisting of molded concrete block units, caps, anchored structural connection devices and Tensar geogrid. (*Id.*).

25.   The licensing agreement, among other things, grants Funsa the right to use Tensar's: (1) proprietary product designs and specifications for manufacturing blocks; (2) installation methods, procedures and specifications; (3) marketing and sales techniques; and, (4) Tensar's Mesa trademark solely for the purposes of manufacturing "blocks" and marketing, selling and installing the components of the Mesa Wall System, all within Panama.  (*Id.* at ¶ 1).

26.  The licensing agreement also makes Funsa responsible for advertising, marketing, promoting and selling Tensar's products and the Mesa Wall System at Funsa's own expense.  (*Id.* at ¶ 3.1).   Under its terms, Funsa is responsible for arranging the manufacturing of the molds; Funsa  may retain an agent to manufacture the blocks and caps.  (*Id.*).

27. Tensar agreed to provide limited training and assistance to help Funsa develop and implement its marketing program.  (*Id.*).  At Tensar's sole discretion and Funsa's expense, Tensar would provide additional assistance, including engineering and technical ***advice*** on specific projects.  (*Id.*).

28. According to the licensing agreement, Funsa is an independent contractor and neither party will be liable for the liabilities of the other party or its employees.  (*Id.* at ¶ 8.6).

29. The licensing agreement includes a Forum Selection Clause which provides that

7

the agreement, and disputes arising from it, are governed by the laws of the State of Georgia.  (*Id.* at ¶ 8.2).

**D.     The Tollway Project (The Concession and Design)**

30.  In 1994, the Republic of Panama, through the Ministry of Public Works (the "MOP") bid the concession for an integrated toll road system, described as a "ring around Panama City."  (DE 276 at p. 2).

31.  On December 29, 1994, the MOP entered into a contract with Pycsa to "design, build, maintain, operate and exploit each of the component sections..." of the tollway project.  (*Id.*).

32.  The tollway project has two components: the Panama-Colon Highway and the Northern Corridor.  (*Id.*).  The Panama-Colon Highway, in turn, has two segments:  a 14 kilometer road from Panama to Madden; and a 40 kilometer road from Madden to Colon.  (*Id.*).  The Northern Corridor likewise has two segments: Phase I is a 13 kilometer road from Albrook to Tinajitas; and Phase II is a 14.5 kilometer road from Tinajitas to Tocumen.  (*Id.*).  Phase II includes the site of La Palmita, the bridge abutment at issue in this litigation.  (*Id*. at p. 4).

33. The Concession Contract between Pycsa and the MOP provides, among other things, that in exchange for building and operating the toll roads, Pycsa received the exclusive right to collect all tolls for a period of 30 years, or until it recovered its project investment plus a pre-determined profit.[8]  (*Id.* at p. 2 & 3).  At that point, operation of the

---

[8]

In its Response to Tensar's Statement of Undisputed Facts, Plaintiff objects to Defendant's attempt to summarize or discuss portions of the several agreements among the parties and states that such agreements must be read as a whole.  This objection does not defeat summary judgment.  First, the parties have provided copies of the relevant agreements and I have reviewed them in their entirety.  Second, Plaintiff does not dispute – nor can it

roadway would revert back to the MOP.  (*Id.* at p. 3).

34. The Concession Contract makes Pycsa responsible for designing the course of the roadways and delivering design plans to the MOP.  (*Id.*).

35.  The Concession Contract acknowledges that Pycsa furnished Vial with the design of the tollway, and that Vial is to rely exclusively on Pycsa's design to obtain information regarding "[g]eotechnical, surface, underground, hydrological, climate and environmental conditions at and near the Job Site."  (DE 278, Ex. F at ¶ 2.3).

36. On June 30, 1999, Pycsa and the MOP added Phase II of the Northern Corridor to the Concession Contract through an addendum.  (DE 276 at p. 4; DE 278 at Ex. D).  The addendum reiterated that Pycsa was responsible for the design of Phase II, and that the design had to be developed and approved in order to ascertain the alignment and the corresponding acquisition of the right-of-way.  (DE 276 at p. 4).

37. Pycsa and the MOP initially agreed that Phase II would take 48 months to build and set an estimated completion date of December 1, 2003.  (*Id.* at 5).

38. On December 3, 2001, however, the MOP sent Pycsa a letter acknowledging that unforseen setbacks in acquisition of the easement had hindered startup of the work, and agreed to divide completion of Phase II into three segments, with the first segment to begin operation on December 1, 2003, the second segment on December 1, 2004, and the third segment on December 1, 2005.  (DE 278 at Ex. M).

39. Construction of the first segment of Phase II, consisting of a 4.5 kilometer segment from Tinajitas to El Golf, was not completed by the December 1, 2003 deadline.

---

dispute based on the plain language of the agreements – that Tensar has accurately summarized the portions of the agreements it has cited to.

(DE 276 at p. 5 & 6).  Problems included opposition by local residents, which at one point stopped all work on Phase II, (DE 278 at Ex. N, & O), and clearing of the right-of-way, (DE 276 at p. 6).[9]

**E.    The Pycsa-Vial Construction Contract**

40. On October 6, 1997, Pycsa entered into a Construction Contract with Vial under which Vial became obligated for the construction of the tollway system.   (*Id.*).    The Pycsa/Vial Construction Contract made Vial solely and fully responsible for the construction methods, coordination of all work, and proper performance of all work.  (*Id.* at p. 3 & 4). The Contract was executed in Panama.  (Jan. 18, 2008 Hr'g Tr.).

41.   Under the terms of the Construction Contract, Vial shall, "on its own or as agent of [Pycsa], obtain the Parts and materials, including the ordering thereof, arrangements for delivery, customs clearance, inspection and acceptance or rejection."  (Pycsa/Vial Construction Contract, DE 278, Ex. F at ¶ 2.2).  The materials Vial was responsible for purchasing included the fill material and the Tensar products used in the Mesa Wall System. (DE 276).

42.   The Construction Contract restricts Vial's liability to Pycsa for late construction, and further limits the damages each may recover from the other.  (*Id.*).  It further provides that the agreement is governed by the laws of Panama.  (DE 278 at Ex. F).

---

[9]

Plaintiff objects to Defendant's characterization of the "pervasiveness" of the issue of clearing the right-of-way. (DE 287 at ¶ 12).  However, Plaintiff does not dispute, and record evidence establishes, that there were problems with the clearing of the right-of-way in order to proceed with construction of Phase II.  (DE 278 at Ex. P).  Likewise, Plaintiff objects to Defendant's characterization of the local residents' opposition.  Nonetheless, Plaintiff does not dispute, and record evidence demonstrates, that there was in fact opposition by local residents which, at one point, stopped all construction.  (DE 278 at Ex. N, & O).  None of these matters are of material importance to this summary judgment motion.

43. Vial began construction of Phase I of the Northen Corridor on or around June 30, 1995.  (DE 276 at p. 4).  Phase I was completed on March 15, 1998, approximately one month behind schedule.  (Declaration of A. Angueira, DE 292 at Ex. 19).

44.  Vial hired Funsa during the construction of Phase I for the manufacture of beams, small slabs, and casting and driving piles.  (DE 276 at p. 7; Abed Depo., DE 269-2 at 49:13-24).  Tensar was not involved in Phase I of the project.  Tensar products were not used in Phase I of the project.

45. The Pycsa/Vial Construction Contract does not specifically reference Phase II of the Northern Corridor.  (*Id.*).  Instead, when construction of Phase II began, Pycsa and Vial entered into a verbal agreement regarding its construction. (*Id.*).

46. From the pleadings and record evidence, it is unclear which individuals from Pycsa and Vial entered into this verbal agreement and what the terms of the verbal agreement were.  However, at the Jan. 18, 2008 hearing, Pycsa's counsel acknowledged that Pycsa and Vial did enter into a verbal agreement which contained the same terms and agreements related to construction issues and the scope of the work and duties of each party as the agreement for Phase I.  (Jan. 18, 2008 Hr'g Tr.).  However, the verbal agreement differed from Phase I in that there was no bond financing for Phase II.  (*Id.*).

F.     **The Funsa-Vial Construction Contract**

47.  Sometime in 2002, Vial and Funsa began to initially discuss the construction of bridge abutments for Phase II of the Northern Corridor.  (*Id.* at p. 7).

48. On October 3, 2002, Vial hired Funsa as ***its own*** subcontractor "to perform the construction of the bridge walls corresponding to the project known as the North Corridor, Phase II, as well as to provide the supervision, labor, tools, materials and equipment

11

necessary for the proper execution of all the jobs." (Funsa/Vial Professional Services Contract, DE 278 at Ex. U). The work included the installation of wall faces, extension of the reinforcing grid and placement of the filtering fill. (DE 276 at p. 9). Although the Contract does not mention the Mesa Wall System, it is undisputed that the parties agreed to utilize this system in the construction of the bridge abutments. (*Id.*).

49. According to the agreement, Funsa agreed to build five bridge walls located in the extension of the North Corridor, Phase II, at: Martin Luther King Avenue; La Fula Street; La Palmita Street; Second Avenue in Torrijos; and, Third Avenue in Torrijos. (DE 278 at Ex. U). The approximate cost for construction for these walls was $212,108.95 USD. (*Id.,* ¶ 1). The contract also included warranty and fine clauses in the event of a breach. (DE 278 at Ex. U at ¶ ¶ 6 & 12).

50. The Contract contains forum selection and choice-of-law clauses, which provide that any claim that arises between the parties in conjunction with the contract shall be submitted to the Courts of the Republic of Panama, and be resolved in accordance with Panamanian law. (*Id.*, ¶ 13).

51. On May 5, 2003, Vial and Funsa executed Addendum No. 1 to their previous Contract. (DE 278 at Ex. U). In the Addendum, Funsa agreed to build expansions and new bridge walls in the following locations: La Fula, La Palmita, and Tinajitas. (*Id.*).

**G.     The Tensar-Vial Business Interactions**

52. On January 10, 2003, Vial obtained a letter of credit from Banco Atlantico in Miami in favor of Tensar to purchase component parts of the Mesa Wall System. (DE 276 at Ex. A).

53. In accordance with the Pycsa-Vial Construction Contract and the Vial-Funsa

Contract, Vial placed several "purchase orders" directly with Tensar for the purchase of Tensar geogrids and connectors to be used in connection with the Mesa Walls used in the bridge abutments.  These purchase orders were received by Tensar in Georgia.  (DE 276 at p. 10); (McDuffie Aff., DE 278-24); (Joint Notice of Compliance, DE 330).

54. Tensar filled the orders and shipped the component parts from Georgia to Vial in Panama. At approximately the same time of shipment of the component parts, Tensar mailed Vial an "Original Invoice" and a "Remittance Copy" of the shipped parts.  (DE 330; Jan. 18, 2008 Hr'g Tr.).

55. The invoices sent to Vial set forth various terms and conditions, including Tensar's written product warranty and limitations of liability.  (*Id.* at p. 10).

56. The limitation of liability found in the invoices provides: "The Seller [Tensar] shall not be liable in any circumstances whatsoever for loss or damage of any kind suffered to or by any third party however caused unless the same shall relate to personal injury or death arising out of the Seller's [Tensar] negligence and the Purchaser [Vial] shall indemnify and keep safe and harmless the Seller from and against all claims for damage, loss or expense of whatsoever nature by any person, or entity other than the Purchaser howsoever arising whether in negligence or otherwise." (*See* Joint Notice of Compliance, DE 330).  Tensar mailed the Original Invoice and Remittance Copy to Vial, its customer. (*Id.*).  There is no evidence, not even an allegation, that Vial objected to the additional terms and conditions.

57. Other "Conditions of Sale" in the back of Tensar's invoices include:

    a.    a choice-of-law clause which provides that the agreement shall be governed by the laws of the State of Georgia, and under which Vial agreed to submit to the jurisdiction of the State of Georgia;

b.    an "Inspection and Condition of the Product" clause providing that "[t]he Purchaser [Vial] shall carefully examine the Product on receipt of the same and shall be [sic] telegram or telefax to be received by the Seller [Tensar] within (2 days [sic] of receipt of the Products ... If no such notice is received ... the Seller shall be discharged from all liability in respect of such defects or short, or over delivery;

c.    a "limited warranty" clause, which provides that the Seller warrants that the Products supplied will be of good and workmanlike quality manufactured in accordance with applicable specifications.  This limited warranty is in lieu of all other warranties, expressed or implied by operation of law;

d.    in addition, under the terms of the agreement, Tensar will not be liable for any consequential or incidental damages arising from the use of its product.;

e.    finally, if the Product does not conform to the provisions of the limited warranty, or if Tensar is liable as a result of the sale, handling or use of the Product, Vial's *exclusive remedy* is the repayment of the purchase price or, at the Seller's option, replacement of the non-conforming goods.

58. The parties have agreed, and the record evidence demonstrates, that Vial began placing orders for Tensar geogrids and connectors, directly from Tensar in Georgia, as early as June 7, 2002 – ***predating the execution of the Vial-Funsa contract and prior to the creation of the final design plans.***

59.    Eduardo Parajon,  Tensar's General Manager of Sales in Latin and Central America testified that he flew to Panama and met with Funsa and Vial in January 2002. The purpose of the meeting was to sell geogrid.  (Parajon Depo., p. 65).

60.  On January 27, 2002, following the meeting in Panama between Parajon, and Eduardo Abed, Engineer and Construction Director for Vial, in which a proposal to build the walls in the Northern Corridor was discussed, Parajon sent an email that stated the following:

a series of walls and/or slopes along a major highway construction project.

14

Pycsa of Mexico is the contractor.  We explained to Eduardo Abed, Director of Construction, and Oscar Delgado, Business Development Manager, some of the options that we can offer, steepened slopes, wrapped face walls, Mesa or a combination of them.  They will use geotextile reinforced walls or ours, depending on price, conditions, etc.  The designs are being done by Ingenieros Geotecnicos, and we visited them the following day.  This project could result in sales above $600,000.

(DE 292; Jan. 18, 2008 Hr'g Tr.).[10]

61. On May 12, 2002, Parajon wrote an email stating:

Fundaciones is in the final stretch in their negotiations with Pycsa for the slopes and walls of the [North Corridor].

Coco Ross [Funsa's manager] specifically asked me to come to Panama on Monday 13 and try to close the deal on Tuesday or Wednesday.

As you know, we are competing against woven geotextiles from Pavco in Colombia, as well as against Tenax, also distributed by Pavco in Colombia. Rodrigo [Valencia, a Project Manager in Tensar's International Division] was doing some final calculations and double checking on some design aspects for me to present to Pycsa during my visit.

62.  On May 14, 2002, Parajon hand delivered, in Panama, a letter to Abed.  (Jan. 28, 2008 Hr'g Tr.).   The letter references the "Reinforced Walls of the North Corridor Second Phase," and contained an attached proposal to "supply geomesh, design and technical support" for Phase II of the Northern Corridor.   The letter further stated that the

---

[10]
At the Jan. 18, 2008 hearing, the parties clarified that work in connection with the tollway project included both the walls and the slopes.  The "slopes" consisted of a series of slopped right-of-ways that lead up (vertically) to the bridge.  As the January 27, 2002 email reflects, Tensar desired to sell its component parts to be used in the construction of both components.  (Jan. 18, 2008 Hr'g Tr.).  It was also stipulated that the slopes do not use connectors or blocks, only geogrids.  (*Id.*).

The parties further clarified that the design for the overall tollway project was done by a Panamanian engineering firm by the name of Ingenieros Geotécnicos (Geotechnical Engineers) (Jan. 18, 2008 Hr'g Tr, 47-48).  As discussed above, the final design of the bridge was stamped and sealed by Funsa in Panama, and the design of the Mesa Wall System by Tensar in Georgia.

prices did not include the cost of the "blocks" or any other facade, and that those prices would be provided by Funsa "in its capacity as representative of Tensar" in Panama.   The proposal required that Vial obtain an irrevocable letter of credit and that the quotation was effective until June 30, 2002.  There is no record evidence that Vial and Tensar entered into a contract under the terms of the proposal.

63.  On May 19, 2002, Mr. Parajon wrote an email indicating that he had visited Panama "trying to close two important projects, Cuatro Altos and [North Corridor]."  The email further states that:

> Also in Panama Coco Ross and I met with Eduardo Abed, project manager of the [North Corridor] project to try to close the deal for the slopes and walls on this project.
>
> As you know, Pavco of Colombia, with woven geotextiles and Tenax grids as a second option, was trying to win this project based on very low prices ... We went through a series of designs until we were able to optimize them and as of my last meeting with Eduardo Abed, we shook hands on our proposal, both for the walls as well as the slopes.
>
> While I do not feel that this is over ..., I believe that we have a very good chance to get the walls and even better one to get the slopes ... I am saying this not only because we shook hands on it, Eduardo Abed gave me a diskette with all the sections in order to do the final designs.

(DE 292;  DE 287 at ¶ 18).

64.  Pycsa's counsel alleges that after the May 2002 "hand shake" agreement in Panama, Funsa began to instruct Vial as to quantity of items that needed to be purchased from Tensar.  (Jan. 18, 2008 Hr'g Tr.).  According to Pycsa, "the order of purchase, was made prior to the contract or the design ... because on advice of Funsa, Vial placed the order..."  (*Id.*).

65.  The record evidence contains the following purchase orders and invoices:

| Vial P.O. No. (Date) | Items Ordered | Price | Tensar Invoice No. (Date) | Price |
|---|---|---|---|---|
| 3915 (6/7/02) | Geotextile | $59,023.90 | 105879 (6/27/02) | $48,835.54 |
| 4124 (10/4/02) | Connectors Table Grid | $80,310.00 | 1058030 (10/29/02) 1058121 (10/29/02) | $74,760.00 $5,550.00 |
| 4250 (12/10/02) | Geogrid | $149,879.00 | 1059802 (1/21/03) 1059804 (1/21/03) 1059805 (1/21/03) 1059844 (1/23/03) | $13,308.92 $66,214.52 $62,863.24 $6,660.00 |
| 4251 (12/10/02) | Connectors Table Grid | $93,753.21 | 1059806 (1/21/03) 1059845 (1/23/03) 1060012 (1/31/03) | $51,559.20 $40,850.42 $2,208.92 |
| 4485 (4/2/03) | Connectors Table Grid, Tensioned Type | $464,880.00 | None | |
| 4533 (5/14/03) | Geogrid, Tensioned Type | $226,227.00 | 1061542 (5/28/03) 1061552 (5/28/03) 1061575 (5/29/03) 1061577 (5/29/03) | $73,401.95 $61,000.00 $54,300.00 $16,524.30 |

66. It is undisputed that none of the Purchase Orders specifically requested "High Performance" connectors.[11]   The purchase orders were for "connectors", and Tensar

---

[11]

It was not clear, from the initial submissions by the parties, whether the final selaed plans called for "high performance" component parts. Pycsa's position has consistently been that the plans called for "high performance" parts, but that Tensar shipped, and Funsa installed, "standard" parts. During the Jan. 18, 2008 hearing, I asked the parties whether there was a dispute as to what type of connectors and geogrids the final plans called for. Pycsa's and Tensar's counsel both stated that the plans called for "high performance" parts. (*See* Jan. 18, 2008 Hr'g Tr.).   In an abundance of caution, I issued an Order Requiring Supplemental Briefing [DE 226] which, among other things, required the parties to file a joint stipulation as to the type of connectors the final plans called for.  In response, the parties filed a Joint Stipulation [DE 342] stating that:

shipped and billed for "standard connectors," and indicated this on the description section of the invoice. (DE 330).

67. Pycsa alleges that it relied on the advice of Funsa in placing its orders for "connectors", specially for the orders placed before the final design had been submitted. (Jan. 18, 2008 Hr'g Tr.). According to Pycsa, Funsa told Vial 'what and how' to order from Tensar. (*Id*.).

68. The final plans for La Palmita – the wall that failed – were signed and sealed by Funsa's engineer on January 7, 2003, and given to Vial, by Funsa, in March 2003, after construction had commenced and after Vial had placed several orders for "connectors." (Jan. 18, 2008 Hr'g Tr.).

69. The last purchase order for "connectors" was sent by Vial to Tensar on April 2, 2003. By that time, Vial had obtained a copy of the final design plans, which called for High Performance Connectors. The April 2, 2003 Purchase Order, however, requested 'connectors' and included the unit price of standard connectors. (DE 330).

## H.    The Design and Construction of the Bridge Abutments

---

As for the block, the Plans specify "units of Mesa blocks."
As for the geogrid, the Plans specify the use of "uniaxial geogrid" or "geogrid reinforcement."
As for the connectors, the Plans specify the use of "Connectors FS2.0."

(Joint Stipulation, DE 342). The Joint Stipulation did not specify whether "FS2.0" refers to standard or high performance connectors. However, as already stated, at the hearing on the instant motion Tensar's counsel agreed that the final plans called for high performance connectors. There is no dispute that the Vial purchase orders did not call for "high performance" parts, and there is no dispute that Tensar shipped and billed for standard connectors. Finally, it is undisputed that the connectors were purchased by Vial prior to the signing and sealing of the final design plans. *See* ¶¶ 67-69 below.

70.   It is undisputed that Carlos Barrera, a Funsa employee since 1994 and a licensed Panamanian engineer, designed, stamped and sealed the drawings for the bridge abutments at La Fula, Martin Luther King, and La Palmita bridges (DE 276 at p. 9); and that Pycsa provided Mr. Barrera information necessary for the designs of the bridge abutments. (DE 287 at ¶ 18). [12]

71. The final design plans created by Mr. Barrera and submitted to the MOP call for the use of High Performance Connectors. (Jan. 18, 2008 Hr'g Tr.).

72. Mr. Barrera has testified that Funsa was ultimately chosen for the design of the abutments, but that he asked Tensar to review and comment on his calculations.  (DE 276 at p. 10).  Mr. Barrera viewed Tensar's contributions as "recommendations" which he could accept or reject.  (*Id.*).

73.   Tensar's engineers participated in design calculations and answered Barrera's technical questions.  (Parajon Depo., p. 62).

74. On May 28, 2002, Valencia, from Tensar, sent Parajon an email stating:

I'm working with Carlos Barrera in the design for [North Corridor].  I have the geometry of the slopes and walls ready and he is going to check them in the field to make sure that the information we have is right.

75. On July 15, 2002, Mr. Valencia sent Mr. Parajon another email, stating:

This week we should receive the final geometry for the slopes and walls of the [North Corridor].  Therefore, hopefully, we should be able to have a final design at the end of this week.

---

[12]

As to the design of the La Palmita bridge abutment, while there is a dispute as to the extent of Tensar's involvement in the design calculations, there is no dispute that Vial hired Funsa as its subcontractor to construct the bridges, and that Funsa's engineer, Carlos Barrera, sealed and signed the final plans.

(DE 292).

76. On August 17, 2002, Barrera, in Panama,  sent Valencia, in Georgia, a fax message stating: "About the bridge for which you are calculating the walls, you have to take into account that the walls do not bear the bridge; the bridge stands on slope."  (DE 292).  The message also included some drawings and length and height specifications for the walls.

77. On October 3, 2002, the Vial-Funsa Contract was executed.    (Professional Services Contract, DE 278 at Ex. U).  The work included the installation of wall faces, extension of the reinforcing grid and placement of the filtering fill.  (DE 276 at p. 9). No contract was executed between Vial and Tensar, or Pycsa and Tensar, for the construction and/or installation of the walls.

78. On December 19, 2002, Mr. Barrera sent Mr. Valencia at Tensar a facsimile stating:

> Rodrigo, please find attached a soil study conducted at the site ... The question is whether the foundation soil will bear the weight and whether the soil can be improved.  North Corridor project, for example [drawings of the project].

(DE 292).

79. On March 24, 2003, Reinaldo VegaMeyer, an engineer in Tensar's Latin American operations, sent Parajon an email stating, among other things:

> I talked several times with [Coco] Ross [from Funsa] who is in charge of taking readings and installing the last crackmeters and settlement instruments.  According to her, everything is going well and by the time this report is written, she shall be done with the installation of those instruments. I will call her on Monday to see how is it going and remind her to take readings at every fill placement.
>
> I did a revision on the design of a 14.8m high Mesa wall for Carlos Barrera, this section was designed by Rodrigo [Valencia of Tensar], but due to the

existing conditions the wall went higher (+ 0.8 m), so I did the revision and
sent the results to Carlos Barrera by e-mail.

(DE 292).

80. On April 16, 2003, Funsa sent Pycsa a fax of a certified letter from Tensar,

signed by Mr. Parajon and addressed to "To Whom It May Concern", indicating that Funsa

is the exclusive distributor for all Tensar products and systems in Panama.   "Moreover, we

state that Eng. Carlos Barrera of Fundaciones, S.A. is qualified to conduct the fabrication

and installation of *Tensar Triton mattresses*."  (DE 292) (emphasis added). The letter is

dated April 2003.  The Triton Mattress is another one of Tensar's systems; it is not related

to the Mesa Wall System.  (Parajon Depo., 90-93).

**I.    Bridge Collapse, Construction Delays and Loss of Concession**

81. Vial and Funsa's construction of the bridge abutments continued until, on

December 13, 2003, the southeast wall of the La Palmita bridge abutment collapsed.  (DE

276 at p. 11).

82. Following the collapse, the MOP conducted its own investigation into the matter,

issued a public report, and fined Pycsa the sum of $25,000.00. (*Id.*).

83. On August 29, 2004, the MOP issued a letter lifting its previous stop order.  (DE

278 at Ex. W).  The letter stated that the suspension of the construction of Phase II was

the result of a fatal accident that occurred at La Palmita, when one of its reinforced dirt

walls collapsed.  (*Id.*).  The letter further stated that the work remained suspended until the

flaws in the reinforced walls were corrected and the residents whose dwellings were

affected due to their proximity to the walls, and who demanded to be compensated by

Pycsa so as to be able to relocate their dwellings elsewhere, were satisfied.  (*Id.*).

84.  The letter went on to state that the following obstacles that had previously

prevented the work from being carried out had been resolved:

a.   the reinforced dirt walls originally built in the existing bridges have been demolished, at the crossings known as La Palmita, La Fula, and Martin Luther King;

b.   new designs for the rebuilding of said works have been submitted to the MOP, to ensure that they include the required structural safety and durability so that the lives and assets of the workers and residents of the area are protected;

c.   Pycsa has compensated the families whose dwellings were closer to the reinforced dirt walls;

d.   Pycsa mitigated the effect of the flooding that were occuring on account of a defective rain drain, in the Santa Marta area;

e.   Pycsa and the MOP agreed to a new road line that minimizes the private condemnation area.  (*Id.*).

85.  In light of these advances, the letter concluded that Pycsa should resume construction of Phase II of the Northern Corridor as soon as possible.  (*Id.*).

86.  At the time of the abutment collapse, Pycsa had not obtained clearance to build any roadway beyond, approximately, kilometer 19.  (DE 276 at p. 12).  This prevented Vial from advancing the roadway any further regardless of the abutment collapse.  (*Id.*)

87.  Mr. Oscar Delgado, a Development Manager at Vial who also worked as a Development Manager for Pycsa during the subject project, has testified that prior to the collapse of the walls, "the greatest delay... that caused the biggest impact on the job was the freeing of the easements..."  (*See* Delgado Depo., DE 267-2 at 18:4-10).

88.  On September 28, 2004, on a letter to the MOP, Pycsa reported a number of problems associated with the right-of-way acquisition which "significantly thwarted" progress on the project. (DE 278 at Ex. X). In the letter, Pycsa stated that the various incidents were associated with the delays and were negatively affecting the entire

concession. (*Id.*).

89. On a letter dated September 29, 2004, Pycsa wrote: "All delays in our project are chiefly due to the failure of the Government to extinguish easements, a failure that makes it impossible for the work to move forward at all and causes serious damages to our company." (DE 278 at Ex. Y).  The MOP responded that Pycsa was in breach of the Concession Agreement by failing to submit the design plans for the remainder of the Phase II work. (DE 276 at p. 13).

90. As of June 13, 2007, Pycsa and the MOP still had not finalized the right-of-way for Phase II.  (*Id.* at p. 14).

91. Pycsa received a notice to proceed with construction of the Madden-Colon Segment of the tollway on November 16, 2001.  (*Id.*).  The concession contract required completion of this segment within forty (40) months of the Order to Proceed.  (*Id.* at n. 24).

92. Pycsa never started construction of the Madden-Colon segment.  (*Id.* at p. 14).  According to Pycsa, it never started the construction because it would have lost money doing so.  (*Id.*).  Mr. Maxim Haddad, a Pycsa representative, testified that Pycsa never began construction of the Madden-Colon segment because it felt that it would not be economically feasible to build the segment until Vial finished construction of the other three segments.  (M. Haddad Depo, DE 264-2 at 68:7-17).  In addition, Pycsa could not begin constructing the segment because the MOP had not cleared the right-of-way. (*Id.*).

93. Pycsa had considered reassigning the Madden-Colon segment before the abutment collapse on December 13, 2003.  (DE 276 at p. 14).

94. Pycsa filed the instant action against Tensar on March 13, 2006. (Compl., DE 1)

95. Thereafter, on June 29, 2006, Pycsa reassigned the right to build the Madden-Colon segment to Odebrecht, to a Brazilian company.[13] (*Id.*).  According to the assignment contract and to Mr. Haddad, Pycsa did not receive any compensation for the assignment. (*Id.*).

**J.    Assignment of Damages**

96. On June 26, 2007, Vial assigned its "extraordinary expenses" incurred following the wall collapse to Pycsa.[14]  (Delgado Depo. at Ex. 214, DE 267).

97. The assignment states, in part, that "[t]he assignor [Vial] by means of this contract assigns irrevocably, **free of charge** in favor of the assignee [Pycsa], all rights with the purpose of collecting the extraordinary expenses incurred in the demolition and construction of the walls and bridges of La Palmita, La Fula and Martin Luther King and the

---

[13]

Tensar argues that the assignment was voluntary, while Pycsa claims that the government of Panama required it to sign the Assignment Agreement.  As further explained in this order, because summary judgment is entered on other grounds, this minor dispute does not defeat the entry of summary judgment.

[14]

The deadline for filing all non-dispositive pretrial motions, including motions for leave to file an amended complaint, was originally set for November 15, 2006 [DE 21].  Upon the parties' request, the deadline was extended to February 13, 2007 [DE 66].  The assignment of damages was executed on June 26, 2007, approximately sixteen months after the filing of this lawsuit and nearly six months after the deadline to amend the complaint had passed, yet immediately after Pycsa lost its efforts to keep Vial's documents from Tensar during discovery.  (*See* Omnibus Order dated June 20, 2007, DE 173).  Throughout this litigation, Pycsa has repeatedly stated that Vial is not a party to this lawsuit, and has attempted to shield Vial documents.  Notwithstanding these assertions, through the assignment, Pycsa seeks to recover millions of dollars in damages Vial purportedly incurred as a result of the bridge collapse.  The assignment, in essence, places Vial as a party to the litigation, and amends the complaint long after the deadline for doing so has passed.  The timing of the assignment and the Magistrate Judge's Orders compelling the production of the Vial documents raises grave doubts as to the appropriateness of the assignment.

Phase II of the Northern Corridor." (*Id.*) (emphasis added).

98. Without the assignment, Pycsa cannot claim many of the sought-after damages, such as:

> a. salaries of persons who worked on the road construction since these persons were employed and compensated by Vial;
>
> b. damages related to equipment and vehicles owned by Vial that were utilized in the construction of the road and which allegedly sat idle during the three-years delay period;
>
> c. the escalation in price of construction materials, including concrete, diesel, base layer material and steel, purchased by Vial.

(DE 276 at p. 19).

99. Pycsa's damages expert has testified that at least as of March of 2007, Pycsa's experts "became aware that the construction company that had incurred a lot of these costs was Constructora Vial and we said, well, you know, why aren't they part of the claim. And what we were told at that meeting was that there was an oral understanding or agreement between the two that Constructora Vial was seeding the claim money or reimbursement to Pycsa." (*Id.*).

## K.   Procedural History

100. On March 13, 2006, Pycsa filed the instant action against Tensar for: (1) strict liability; (2) negligence; (3) negligent hiring; and, (4) negligent supervision. (*See* DE 1).

101. On May 3, 2006, Defendant filed a Motion to Dismiss Plaintiff's Complaint or, in the Alternative, to Strike Certain Paragraphs of Plaintiff's Complaint, and Motion for a More Definitive Statement [DE 9].

102. In its Motion to Dismiss, Tensar argued that the strict liability and negligence claims were barred by the Economic Loss Rule, and that all counts should be dismissed

for failure to join indispensable parties Multiblock and Funsa.  (*See* Motion to Dismiss, DE 9).

103. On December 18, 2006, I issued an Order Denying Tensar's Motion to Dismiss [DE 75].  In that Order, I stated that the parties acknowledged that: (1) Panama did not have an Economic Loss Rule; and, (2) that Georgia's Economic Loss Rule contained exceptions that would permit the claim to survive a Motion to Dismiss.  (*See* Order Denying Motion to Dismiss, DE 75 at pp. 5-7).  In addition, I concluded that if Florida law applied to the claims, Florida's Economic Loss Rule would apply to Pycsa's claims of strict liability and negligence since it was suing a manufacturer of a product for purely economic damages.  Moreover, I noted that "Pycsa acknowledge[d] that it is suing a manufacturer of a product and its claims are therefore subject to the economic loss rule."  (Dec. 18, 2008 Order, DE 75 at p. 9).

104. In discussing the exceptions to Florida's Economic Loss Rule, I concluded that Pycsa could not avail itself of the personal injury exception to Florida's economic loss rule because it had suffered no personal injury, and it could not assert the claims of the individuals injured by the bridge collapse.  (*See* Dec. 18, 2006 Order, at pp. 9-10).

105. As to the "other property" exception to the economic loss rule, I concluded that "[g]iven the strict standards for dismissal ... [and] based on the pleadings," the other property exception may apply to this case. (*See* Dec. 18, 2006 Order, at pp. 10-11).  For this reason, I denied the request to dismiss Counts I and II based on the economic loss rule.  In so doing, I noted that should evidence be adduced during the discovery process that no other property was damaged, Tensar could renew its argument in a motion for summary judgment.  (*Id*. at p. 11, n. 7).

106. In the Dec. 18, 2006 Order, I further concluded that while Multiblock and Funsa were potential joint tortfeasors, joinder in this case was merely permissive and would destroy diversity jurisdiction; therefore, I denied Tensar's request to dismiss the complaint based on the alleged failure to join indispensable parties. (*Id.* at pp. 11-16).

107. Finally, I granted in part Tensar's Motion to Strike several paragraphs of the Complaint as redundant, immaterial, impertinent and scandalous. Specifically, I concluded that paragraphs 74-80 describing Tensar's alleged efforts to influence Panamanian Government officials and the Panamanian Government's Investigation of the bridge collapse should be stricken as having no bearing on the claims in Pycsa's complaint and as being potentially injurious to Tensar's reputation. (*Id.* at pp. 16-17).

108. There have been no amendments to the Complaint, and the deadline to seek leave to amend the Complaint was February 13, 2007. (*See* Order Granting Motion for Extension of Time to File All Non-Dispositve Pre-Trial Motions, DE 66).

109. On October 10, 2007, Tensar filed the instant Motion for Summary Judgment [DE 260].

## II. Legal Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment when the pleadings and supporting materials show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1577 (Fed. Cir. 1989). The court's focus in reviewing a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter

of law." *Anderson*, 477 U.S. at 252.  It has long been established that summary judgement is appropriate in a patent case where there is no genuine issue of material fact.  *See, e.g., id.* at 1561*; Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*, 731 F.2d 831 (Fed. Cir. 1984) (summary judgment on issue of validity); *Townsend Eng'g Co. v. HiTec Co.*, 829 F.2d 1086, 1089 (Fed. Cir. 1987) (summary judgment on issue of infringement).

The moving party bears the initial burden under Rule 56(c) of demonstrating the absence of a genuine issue of material fact.  *Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc.,* 853 F.2d 1557, 1560 (Fed. Cir. 1988).  Once this burden is satisfied, the burden shifts to the party opposing the motion to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." *Celotex v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553 (1986).  Thus, a non-movant "must do more than present some evidence on an issue it asserts is disputed." *Avia Group Int'l, Inc.,* 853 F.2d at 1560.  A factual dispute is genuine only if the evidence is such that a reasonable fact finder could return a verdict for the non-moving party.  *Anderson,* 477 U.S. at  248.  If the Plaintiff has failed to "make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, then the court must enter summary judgment for the moving party." *Burger King Corp. v. Ashland Equities, Inc.,* 217 F. Supp. 2d 1266, 1273 (S.D. Fla. 2002).

In assessing whether the movant has met its burden, the court should view the evidence in the light most favorable to the party opposing the motion and should resolve all reasonable doubts about the facts in favor of the non-moving party.  *Avia Group Int'l,* 853 F.2d at 1560.  In determining whether to grant summary judgment, the court must remember that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*,

477 U.S. at 255.

### III.   Analysis

### A.    Applicable Law

This case is before me on diversity grounds pursuant to  28 U.S.C. § 1332; therefore, Florida's substantive law, including its choice-of-law rules, applies.  *Grupo Televisa, S.A. v. Telemundo Communs. Group, Inc.,* 485 F.3d 1233, 1240 (11th Cir. 2007); *Great Am. E&S Ins. Co. v. Sadiki,* 170 Fed. Appx. 632, 633-34 (11th Cir. 2006) (citing *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938); *Keller v. Miami Herald Publ'g Co.*, 778 F.2d 711 (11th Cir. 1985))*.*  In its choice-of-law analysis, as a preliminary matter, the Court must characterize the legal issue and determine whether it sounds in torts, contracts or the like. *Telemundo,* 485 F.3d at 1240.  This characterization determines the choice-of-law rule that the forum state applies to the particular legal issue.  *Id.*

In tort cases, Florida applies the "significant relationship" test delineated in § 145 of the Restatement (Second) of Conflict of Laws.[15]  *Telemundo,* 485 F.3d at 1240 (citing *Bishop v. Fla. Specialty Paint Co.,* 389 So. 2d 999, 1001 (Fla. 1980)).  The test involves consideration of several factors to find the state with the most significant contacts in

---

[15]

Specifically, § 145 provides:

> The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

Restat. 2d of Conflict of Laws, § 145. In contrast, when determining which law applies to contracts, Florida adheres to the *lex loci contractus*, which provides that the contract is governed by the law of the place where the contract was executed.  *State Farm Mut. Auto. Ins. Co. v. Roach*, 945 So. 2d 1160, 1162-1163 (Fla. 2006).

relation to the occurrence and to the parties, with due regard for the policies underlying each of the competing state's pertinent laws. *Nelson v. Freightliner, LLC,* 154 Fed. Appx. 98, 102-03 (11th Cir. 2005)*; Projectors Ins. Co. v. Valsecchi*, 435 So. 2d 290, 204 (Fla. 3d DCA 1983). "In tort actions involving more than one state, all substantive issues should be determined in accordance with the law of the state having the most 'significant relationship' to the occurrence and the parties." *Merkle v. Robinson*, 737 So. 2d 540, 542 (Fla. 1999) (citing *Bishop*, 389 So. 2d at 1001); *Telemundo,* 485 F.3d at 1240.

The first step in conducting the analysis is to determine which sovereigns have an interest in applying their laws. *Judge v. Am. Motors Corp.,* 908 F.2d 1565, 1568 (11th Cir. 1990). Once the interested sovereigns have been identified, the court must consider the threshold issue of whether there is a "true conflict" among the jurisdictions with an interest in a particular issue or merely a "false conflict." *See Tune v. Phillip Morris, Inc.,* 766 So. 2d 350, 352 (Fla. 2d DCA 2000). A "false conflict" exists where the laws of the interested jurisdictions are: (1) the same; (2) different but would produce the same outcome under the facts of the case; or, (3) when the policies of one jurisdiction would be furthered by the application of its laws while the policies of the other jurisdiction would not be advanced by the application of its laws. *See Tune*, 766 So. 2d at 352. On the other hand, a true conflict exists when "two or more states have a legitimate interest in a particular set of facts in litigation and the laws of those states differ or would produce a different result." *Walker v. Paradise Hotel, Ltd.,* No. 01-3564, 2003 U.S. Dist. LEXIS 25660, at *5 (S.D. Fla. April 24, 2003). If only a "false conflict" is presented in any of the counts in this case, I will apply Florida law. *See* Dec. 18, 2006 Order Denying Defendant's Motion to Dismiss, DE 75*; Cavic v. Grand Bahama Dev. Co.,* 701 F.2d 879, 882 (11th Cir. 1983) (stating that "under

applicable conflict-of-laws principles the law of the forum would govern the substantive issues due to the absence of facts justifying the application of the law of some other jurisdiction."); *see also*, *Hilton Int'l Co. v. Carrillo*, No. 3D07-1773, 2008 Fla. App. LEXIS 212 (Fla. 3rd DCA Jan. 9, 2008)*.*

A comprehensive conflict-of-law analysis is only required if the case involves a true conflict.  *Tune*, 766 So. 2d at 352.  In such instances, the court conducts a two-pronged inquiry directed towards review of the factors listed in §§ 145 and 6 of the Restatement (Second) of Conflict of Laws.  *Proprietors Ins. Co. v. Valsecchi*, 435 So. 2d 290, 294 (Fla. 3d DCA 1983).  While § 145(1) sets out the basic principle for tort actions, § 145(2) lists the four contacts that courts should consider in applying the choice-of-law principles of § 6.  *Telemundo,* 485 F.3d at 1240.  The four contacts to be considered are: "(a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and, (d) the place where the relationship, if any, between the parties is centered." Restat. 2d of Conflict of Laws, § 145(2); *Telemundo,* 485 F.3d at 1240.  The Restatement advises that "[t]hese contacts are to be evaluated according to their relative importance with respect to the particular issue." *Telemundo,* 485 F.3d at 1240 (citing Restat. 2d of Conflict of Laws, § 145).

The four relevant contacts must then be evaluated in light of the following competing policy considerations: "(a) the needs of the interstate and international systems; (b) the relevant policies of the forum; (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; (d) the protection of justified expectations; (e) the basic policies underlying the particular field of

31

law; (f) certainty, predictability and uniformity of result; and, (g) ease in the determination and application of the law to be applied." *Id.* at § 6(2); *Telemundo,* 485 F.3d at 1242-43. The purpose of the test is not to find the sovereign with the most contacts; rather, the analysis is done to determine which jurisdiction has the most "significant" contacts. *Judge,* 908 F.2d at 1569. Both the Restatement and the courts have recognized that subsections (d) and (f) play little significance in the choice-of-law analysis in tort cases. *See, e.g., Medina v. Am. Airlines,* Case No. 02-22133, 2005 U.S. Dist. LEXIS 18916, at *21 (S.D. Fla. July 5, 2005) ("[T]he Restatement generally gives little significance to factors (d) and (f) in tort cases.").

The Florida courts have formulated few hard-and-fast rules to guide the application of these principles. It is true, on the one hand, that "[t]he state where the injury occurred would, under most circumstances, be the decisive consideration in determining the applicable choice of law." *Bishop*, 389 So.2d at 1001. But it is equally true that "the state where the injury occurred may have little actual significance for the cause of action," and that "[o]ther factors may combine to outweigh the place of injury as a controlling consideration." *Id*. Conflict-of-laws questions thus cannot be resolved by reciting general pronouncements; to determine which sovereign has the "most significant relationship" to a particular issue, a court must instead examine the facts and circumstances presented in each particular case. *See Stallworth v. Hospitality Rentals, Inc.*, 515 So.2d 413, 418 (Fla. 1st DCA 1987) (after declining to apply law of state in which injury occurred, court states that decision is "necessarily limited to the specific facts of this appeal."). Nonetheless, in *Bishop*, the Florida Supreme Court explained that while Florida has adopted the more flexible conflicts theory set out in the Restatement, the "place of injury"

32

rule, under which the law of the jurisdiction in which the injury occur applies, has not been abandoned completely. *Bishop*, 389 So.2d at 1001. In fact, under Florida law, absent special circumstances, "[t]he state where the injury occurred would ... be the decisive consideration in determining the applicable choice of law." *Bishop*, 389 So.2d at 1001.

In *Grupo Televisa, S.A. v. Telemundo Communs. Group, Inc.*, 485 F.3d 1233, 1240 (11th Cir. 2007), the Eleventh Circuit discussed the importance of the place where the conduct causing injury took place. *Telemundo* is the Eleventh Circuit's most recent statement of Florida's choice-of-law rules. In *Telemundo*, § 145 applied because the case involved a "tort action." 485 F.3d 1233. In analyzing choice-of-law principles, the Eleventh Circuit carefully evaluated the commentary, which it found the district court ignored, which provided that in cases involving misappropriation of trade values, the principal location of the defendant's conduct is the single most important contact. *Id.* at 1240. Although this case does not involve a claim of misappropriation of trade values, the Eleventh Circuit's emphasis on the Restatement's commentary is significant and must be considered in the resolution of this case.

In reversing the district court in *Telemundo*, the Eleventh Circuit focused on the commentary to § 145 which the district court had ignored. In explaining the interrelation between the place where the injury occurred and the place where the conduct causing injury took place, pertinent parts of comment 2(e) to § 145 provide:

> *The place where injury occurred.* In the case of ... injuries to tangible things, the place where the injury occurred is a contact that ... plays an important role in the selection of the state of the applicable law. This contact likewise plays an important role in the selection of the state of the applicable law in the case of other kinds of torts, provided that the injury occurred in a single, clearly ascertainable, state. This is so for the reason among others that persons who cause injury in a state should not ordinarily escape liabilities imposed by the local law of that state on account of the injury... Situations do

arise, however, where the place of injury will not play an important role...

*The place where conduct occurred*.  When the injury occurred in a single, clearly ascertainable state and when the conduct which caused the injury also occurred there, that state will usually be the state of the applicable law with respect to most issues involving the tort. This is particularly likely to be so with respect to issues involving standards of conduct, since the state of conduct and injury will have a natural concern in the determination of such issues.

Choice of the applicable law becomes more difficult ... where the defendant's conduct and the resulting injury occurred in different states. When the injury occurred in two or more states, or when the place of injury cannot be ascertained or is fortuitous and, with respect to the particular issue, bears little relation to the occurrence and the parties, the place where the defendant's conduct occurred will usually be given particular weight in determining the state of the applicable law ... [W]hen the primary purpose of the tort rule involved is to deter or punish misconduct, the place where the conduct occurred has peculiar significance...

In this case, it is undisputed that Panama is the place where the injury occurred. However, this is one of those cases in which at least some of the defendant's conduct and the resulting injury occurred in different places.  While the place where the conduct occurred is not the "single most important contact [as] in cases involving misappropriation of trade values", *Telemundo*, 485 F.3d at 1241, this factor is nonetheless a significant one to the resolution of the choice-of-law analysis in this case.   For this reason, the place where the injury occurred is not in and of itself dispositive in the Court's choice-of-law analysis, and this Order will discuss in detail the location of Defendant's conduct in the context of each particular legal theory.

## 1.     Interested Jurisdictions

As a preliminary matter, I agree with the parties that Panama, Georgia, and Florida have an interest in this litigation.  I will discuss each jurisdiction's interest in turn.

### i.    Panama

Panama has a significant, if not compelling, interest in the application of its laws for several reasons.  First, Pycsa, Vial and Funsa are all Panamanian corporations.  Second, it is undisputed that Pycsa's alleged injury occurred in Panama as a result of the collapse of the La Palmita bridge abutment.  Third, for counts I and II, the alleged conduct causing the injury is the design and manufacturing of the retaining walls and its component parts, as well as the shipping of the wrong component parts.  It is undisputed that at least some of the design drawings and calculations for the retaining walls were prepared in Panama, and that the final design drawings and calculations were sealed and signed by Funsa's engineer in Panama.  Further, a Panamanian company, Multiblock, S.A., manufactured the subject modular retaining wall blocks in Panama which Pycsa alleges caused, in part, the collapse of the bridge.  Moreover, Vial selected and supplied the backfill material, which is the reinforcing medium that engages the grid to support the structure, in Panama.  Similarly, the conduct causing the injury alleged in Counts III and IV is Funsa's failure: (1) to ensure that the proper materials were shipped by Tensar, (2) to ensure that the block mold matched the plans; (3) to properly backfill the retaining wall; (4) to maintain the integrity of the blocks; (5) to install the blocks without excessive shimming; and, (6) to account for proper drainage.  (*See* Compl. ¶¶ 95, 104).  All of these alleged acts occurred in Panama; as did the engineer's failure to ensure that the bridges were built in accordance with the plans.    Fourth, the relationship between the parties was partly centered in Panama.  Specifically, Tensar's employee, Mr. Parajon, met with Vial engineers in Panama to finalize the terms of the sale of Tensar products.  Vial ordered several Tensar component parts from Panama and, ultimately, Tensar shipped these component parts to

Vial in Panama.  Finally, in addition to the Restatement factors, three Panamanian children were fatally injured as a result of the bridge collapse, and Panama has an interest in protecting the lives of its citizens.   For these reasons, Panama has a significant interest in the application of its laws.

In sum, the contacts with Panama include the following:

1.     The collapse of the bridge – and Pycsa's alleged injuries – occurred in Panama;

2.     The tollway project, including the subject bridge abutments, was being built in Panama;

3.     Pycsa bid for the concession of the tollway project in Panama;

4.     Pycsa received the concession of the tollway project from the Panamanian government;

5.     Pycsa is incorporated and has its principal place of business in Panama;

6.     Vial is incorporated and has its principal place of business in Panama;

7.     Funsa is incorporated and has its principal place of business in Panama;

8.     The Pycsa/Vial Construction Contract was executed in Panama, and governed by the laws of Panama;

9.     The Vial/Funsa Construction Contract was executed in Panama, and is governed by the laws of Panama;

10.    The Pycsa/MOP Agreement was executed in Panama, and is governed by the laws of Panama;

11.    The final design for the bridge abutments was signed and sealed by Carlos Barrera, in Panama, and submitted to the Panamanian Government;

12.    Carlos Barrera, the engineer responsible for the construction of the bridges, is licensed in Panama by the Panamanian government;

36

13.     Two of the four components of the retaining wall were manufactured or found in Panama: the "blocks" were manufactured in Panama by Multiblock, a Panamanian Company; the soil came from Panama;

14.     The overall design of the tollway project was done in Panama, by Ingenieros Geotecnicos, a Panamanian Company;

15.     Vial bid for the bridge abutments section of the project in Panama;

16.     Funsa engaged in preliminary negotiations with Vial for the sale of the Tensar geogrid and connectors in Panama.

17.     Tensar representatives met with Vial representatives in Panama to finalize the terms of the sale of Tensar geogrids and connectors;

18.     Vial ordered the component parts from Tensar from Panama;

19.     Vial received the component parts from Tensar in Panama;

20.     Vial sent its payment to Tensar from Panama;

21.     Carlos Barrera's alleged failure to check that the component parts shipped by Tensar conformed to what the sealed plans called for occurred in Panama;

22.     Following initial reports of a crack in the walls, Pycsa asked Funsa for reassurances, and received the same from Funsa, in Panama;

23.     Tensar visited the construction site in Panama on at least one occasion;

24.     Three Panamanian children died in the collapse of the bridge;

25.     The assignment of damages from Vial to Pycsa was executed in Panama, and is governed by the laws of Panama;

26.     Funsa's alleged failures to ensure that (1) the block mold matched the design plans; (2) the integrity of the blocks was properly maintained; (3) the blocks were installed without excessive shimming; and, (5) there was proper drainage, occurred, if at all, in Panama;

27.     Tensar's alleged failure to supervise Funsa, if such a duty existed, occurred in Panama;

28.     Funsa's failure to inspect the goods shipped by Tensar occurred in

37

Panama.

**ii.____Georgia**

Georgia also has an interest in this litigation.  First, Tensar is incorporated, has its principal place of business, and conducts business throughout Georgia.  Second, the geogrid – one of the four components of the subject retaining walls – was designed and manufactured in Georgia.  Moreover, Tensar shipped its products, including the geogrids and connectors, to Vial from Georgia, prepared and mailed its invoices from Georgia, and received payment from Vial in Georgia.  Thus, the relationship between Vial and Tensar was centered, in part, in Georgia.  Third, some of the conduct causing injury occurred in Georgia.  (*See* Compl., ¶¶ 88, 92).  Specifically, the following acts occurred in Georgia: (1) the alleged defective and deficient design of the Tensar connectors; (2) the alleged defective design and manufacturing of Tensar's geogrids; (3) the alleged failure to ship to Vial the appropriate Tensar components; and, (4) some of the design calculations for the bridge abutments were done by Tensar engineers in Georgia.

Per the record evidence and the parties' agreement, contacts with Georgia include:

1.      The Geogrids were designed and manufactured in Georgia;

2.      The Mesa Wall System was designed in Georgia;

3.      Tensar is incorporated and has its principal place of business in Georgia;

4.      The two contracts between Tensar and Funsa were executed in Georgia, and are governed by the laws of Georgia;

5.      Tensar received the Vial purchase orders for geogrids and connectors in Georgia;

6.      Tensar filled Vial's orders in Georgia, and shipped the products to Vial from Georgia;

7.    Tensar received payment from Vial in Georgia;

8.    Tensar received communications about the status of the agreement with Vial in Georgia;

9.    Tensar engineers communicated with Carlos Barrera and others regarding the design of the bridge abutments from Georgia;

10.   Tensar's engineers engaged in design mathematical calculations for the subject bridge abutments in Georgia;

11.   The invoices, including the Conditions of Sale, shipped to Vial along with the component parts, indicate that the sale transaction is governed by the laws of Georgia;

12.   The plant in which the geogrids are manufactured is in Georgia;

13.   The alleged shipping of the wrong component parts occurred from Georgia.

### iii.   Florida

Neither the injury nor any of the conduct causing the injury occurred in Florida. Moreover, the relationship between the parties was not centered in Florida. While Florida is neither Tensar's nor Pycsa's place of incorporation, nor their principal place of business, Florida has an interest in this case because Defendant Tensar has been registered to conduct business in Florida since 1997, and its products have been used on projects throughout the State of Florida. *See Cortes v. Am. Airlines, Inc.*, 177 F.3d 1272, 1298 (11th Cir. 1999) ("We agree that a party's principal place of business ordinarily should be afforded more weight than a jurisdiction in which the party has only business interests, but we cannot agree that a jurisdiction in which the party has sizeable business activities--especially when the activities are directly related to the relevant litigation--has no relationship with the litigation for purposes of section 145(2)"). Additionally, the record evidence demonstrates that Vial procured the financing for the purchase of the Tensar

39

geogrid and connectors at Banco Atlantico in Miami.   Finally, Florida has an interest as the jurisdiction in which this lawsuit was filed.   *See Walker*,  No. 01-3564, 2003 U.S. Dist. LEXIS 25660 at * 9.

To summarize, contacts with Florida include the following:

1.      Tensar is registered to do business in Florida since 1997;

2.      Tensar's Mesa Wall System and its component parts have been used throughout Florida in projects unrelated to this matter;

3.      Pycsa has used the Miami office of one of its affiliate, 27 MHMS, for the procurement of materials and for the bidding process of the tollway project (Haddad Depo.);

4.      Pycsa has a banking relationship at Banco Atlantico, Miami, Florida; and, Pycsa obtained financing for the purchase of the Tensar geogrids and connectors from this bank;

5.      The litigation was commenced in Florida.

## B.      Choice-of-Law Analysis for Strict Liability

_____In Count I, Plaintiff alleges that Tensar placed the Mesa Wall System and its component parts into the stream of commerce with knowledge that the design, implementation and components would be within the exclusive use and control of Tensar and its agent – and not be inspected by Pycsa for defects.[16]   Plaintiff also alleges that

---

[16]

As an aside, I note that Plaintiff has submitted no evidence as to Tensar's "knowledge" that the component parts would not be inspected by Pycsa for defects.  In contrast, copies of the invoice accompanying the component parts purchased by Vial from Tensar specifically state:

> INSPECTION AND CONDITION OF THE PRODUCT
> The Purchaser [Vial] shall carefully examine the Product on receipt of the same and shall be [sic] telegram or telefax to be received by the Seller [Tensar] within (2 days [sic] of receipt of the Products ... If no such notice is received ... the Seller shall be discharged from all liability in respect of such defects or short, or over delivery.

(Conditions  of  Sale  on  Tensar's  Original  Invoice  to  Vial,  DE  330).  Similarly,  the

Tensar placed the particular implementation of the Mesa Wall System into the stream of commerce with knowledge that its component parts and system had not been properly tested.  According to Plaintiff, the defective and deficient design, manufacturing, and implementation of the Mesa Wall System caused Pycsa to suffer damages when the bridge abutment at La Palmita collapsed.  Based on these facts, Plaintiff brings a claim for strict products liability against Defendant.

Since Panama, Georgia, and Florida have an interest in this matter, I must first determine whether there is a true conflict as to Pycsa's claim of Strict Products Liability. As discussed in this section, a true conflict exists because, at the time of the bridge collapse, Florida recognized a claim for Strict Products Liability, Georgia recognized the claim only when the aggrieved party is a natural person, and Panama did not recognize a claim for Strict Products Liability.  Because a true conflict exists, I must engage in the two-pronged inquiry of the factors listed in §§ 145 and 6 of the Restatement (Second) of Conflict of Laws.  *Proprietors Ins. Co.,* 435 So. 2d at 294.

## 1.    Significant Contacts Under § 145

I reiterate that relevant contacts include: "(a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and, (d) the place where the relationship, if any, between the parties is centered."  Restat. 2d of Conflict of Laws, § 145(2); *Telemundo,* 485 F.3d at 1240.  Each contact is analyzed below as it

---

Construction Contract between Pycsa and Vial provides that Vial is responsible, among other things, for the "inspection and acceptance or rejection" of the parts and materials obtained for the project.  (Pycsa/Vial Construction Contract, DE 278, Ex. F at ¶ 2.2).

relates to the claim of strict liability in each of the interested jurisdictions.

### i.   Panama

In this case, it is undisputed that Panama is the place where the injury occurred. Panama is also the place of incorporation and principal place of business of Vial, Pycsa, and Funsa – three of the four key parties in this case.  In addition, at least part of the conduct causing injury occurred in Panama.  The alleged conduct causing the injury in count I is the design and manufacturing of the retaining walls and its component parts.  It is undisputed that the design drawings and at least some, if not most, of the design calculations were prepared in by Carlos Barrera in Panama.  It is also undisputed that the final design drawings and calculations were sealed and signed by Barrera in Panama.  As to the component parts, the soil came from Panama, and the blocks were manufactured in Panama, ordered in Panama from a Panamanian Company, and paid for in Panama. All of the component parts were assembled by Funsa in Panama.  Finally, the relationship between Tensar and Pycsa, and Tensar and Vial, as it relates to the injurious conduct alleged in Count I, was centered, in part, in Panama: (1) Tensar and Vial met in Panama to discuss and finalize the sale of component parts; (2) Tensar shipped its products to Vial, along with its invoices, to Panama; (3) the Mesa Wall System, as a whole, was bid and sold to Vial in Panama; (4) the construction of the bridge abutments – which gives rise to the Tensar/Vial relationship – took place in Panama; and, (5) Tensar visited the construction site in Panama.  Therefore, all four factors of the Restatement, including the often determinative factor of the place where the injury occurred, leads me to conclude that Panama is the jurisdiction with the most paramount interest in having its laws applied to Pycsa's claim of strict products liability.  In addition to these factors, it is important to note that the assignment of damages from Vial to Pycsa, which purports to give Pycsa standing

42

to collect a large percentage of the damages sought, was executed in Panama and is governed by Panamanian law.

### ii.      Georgia

Georgia also has a legitimate interest in this litigation.  While the injury did not occur in Georgia, Tensar is incorporated and has its principal place of business in Georgia.  In addition, at least some of the alleged conduct causing injury as it relates to Count I occurred in Georgia.  For example, the geogrids were designed and manufactured in Georgia; the Mesa Wall System was designed in Georgia; although not manufactured in Georgia, the connectors  were designed in Georgia and were sold from Georgia as a Tensar product; and, Tensar's engineers engaged in design mathematical calculations in Georgia.  Likewise, part of the relationship between Tensar and Pycsa, and Tensar Vial, was centered in Georgia; that is, the purchase orders were received in Georgia, and communications among the parties, whether related to price, design, or other topics, were received by Tensar in Georgia.  Therefore, three of the four relevant factors point to Georgia as a jurisdiction with a very strong interest in having its laws applied to Count I. In addition to the Restatement factors, the Tensar invoices which accompanied the shipping of the Tensar components parts sold to Vial expressly state that the transaction would be governed by the laws of Georgia.

### iii.      Florida

Florida, on the other hand, has the least interest in having its laws applied to this matter.  Neither the injury or the conduct causing injury occurred in Florida, and the relationship between Tensar and Pycsa was not centered in Florida.  The only § 145(2) factor that justifies the application of Florida law is that both parties minimally conducted business in the state.  *Cf. Cortes,* 177 F.3d at 1298 ("We agree that a party's principal

place of business ordinarily should be afforded more weight than a jurisdiction in which the party has only business interests, but we cannot agree that a jurisdiction in which the party has sizeable business activities--especially when the activities are directly related to the relevant litigation--has no relationship with the litigation for purposes of section 145(2)"). In addition to the Restatement factors, Florida has an interest as the jurisdiction in which the lawsuit was filed. Nonetheless, Florida's limited interest in that the parties transact business in the state, and in being the forum state, is greatly outweighed by Panama's and Georgia's more significant contacts related to Count I.

## 2.    Section 6 of the Restatement (Second) of Conflict of Laws

The next step in the choice-of-law analysis is to evaluate the relevant contacts in light of the competing policy considerations delineated in § 6 of the Restatement. *See Telemundo*, 485 F.3d at 1242-1243. The commentary to § 6 "cautions that the factors are not listed in order of relative importance and that varying weight will be given to particular factors in different areas of law." *Id.* at 1243 (citing Restat. 2d of Conflict of Laws, § 6(2) cmt. c). Nonetheless, absent special circumstances, "[t]he state where the injury occurred would ... be the decisive consideration in determining the applicable choice of law." *Bishop*, 389 So.2d at 1001. As discussed in section III.A of this Order, the protection of justified expectations, and the certainty, predictability and uniformity of result are not important in tort cases such as this one. *Medina,* 2005 U.S. Dist. LEXIS 18916, at *21 ("[T]he Restatement generally gives little significance to factors (d) and (f) in tort cases."). I thus turn to the remaining factors under § 6 as they apply to Count I.

### i.    Panama

To assist the Court in its determination of Panamanian law, Defendant offered the testimony of Jorge Federico Lee, a licensed Panamanian attorney and former Alternate

Justice, and Justice, of the Supreme Court of the Republic of Panama.[17]  Dr. Lee submitted

two affidavits, (*see* Lee Aff., DE 69 at Ex. D & 259), which were accepted by me as his

direct examination, and was subject to cross-examination, re-direct, and re-cross during

the December 11, 2007 Evidentiary Hearing.  Defendant also submitted the affidavit of

Manuel Rios Vasquez, a licensed Panamanian attorney, *see* Vasquez Aff., DE 259 & 299,

and a Joint Affidavit of Dr. Lee and Carlos Lucas Lopez, also a licensed Panamanian

attorney, *see* Lee & Lopez Joint Aff., DE 300.  In turn, Plaintiff submitted the Joint Affidavit

of Arturo Hoyos and Simon Tejeira Quiros; both are licensed Panamanian attorneys.  (*See*

Hoyos & Quiros Joint Aff., DE 289).  Dr. Hoyos was subject to cross-examination, re-direct,

and re-cross during the December 11 Evidentiary Hearing.  Finally, the parties submitted

translations of the relevant sections of the Panamanian Civil Code, special laws, and

relevant case law.[18]

---

[17]

Federal Rule of Civil Procedure 44.1 provides that "[t]he court, in determining foreign law may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination shall be treated as a ruling on a question of law."  Fed. R. Civ. P. 44.1. Among other things, pursuant to Rule 44.1, I held a day-long evidentiary hearing to ascertain the meaning of Panamanian law.  Therefore, while the parties submitted contradicting testimony as to the meaning of Panamanian law, these disputes as to a question of law do not defeat summary judgment.

[18]

The Supreme Court of Panama is comprised of nine Justices and divided into four chambers: Civil Chamber ("Sala Primera"), Criminal Chamber ("Sala Segunda"), Administrative Chamber ("Sala Tercera"), and General Business Chamber ("Sala Cuarta"). (*See* Lee & Lopez Joint Aff., DE 300 at ¶ 18). The Civil, Criminal, and Administrative Chambers each have three presiding Justices.  (*Id.*).  The Chief Justices from each of these chambers also serve in the General Business Chamber. (*Id.*; *see also* Jan. 8, 2008 Evidentiary Hr'g Tr.).

Dr. Hoyos and Dr. Lee both served as justices of the Supreme Court of the Republic of Panama.  Specifically, Dr. Hoyos was an Associate Justice of the Supreme Court of Panama assigned to the Administrative Chamber from 1990 to 1994.  From 1995 to 2000, he served as the Chief Justice of the Administrative Chamber; he retired from the bench on December 31, 2005.  (Hoyos Aff., DE 289 at ¶¶ 5-6; *see also* Jan. 8, 2008 Evidentiary

In Panama, tort law is governed by Articles 1644 through 1652A of the Civil Code of the Republic of Panama ("Civil Code"), as well as through several special laws that regulate tort liability in specific cases.[19]  (Lee Aff., DE 69, Ex. D at ¶15).  The general rule in Panama's tort law is "subjective liability" which is liability that arises due to negligence.  (Lee Aff., DE 259 at ¶ 20).  Strict liability, on the other hand, recognizes the concept of "objective liability", that is, liability that does not require negligence.  (*Id.*). The application of "objective liability" (i.e. strict liability) is the exception to the norm.  (*Id.* at ¶¶ 25-30).  This exception is triggered only when there is a statute on point imposing strict liability.  (*Id.* at ¶¶ 24, 31, 32).   In keeping with this rule, general negligence in Panama is governed by Article 1644, which provides:

> Whoever by action or omission causes harm to another, with *culpa* or negligence intervening, has the obligation to make reparation for the harm caused.

*See also Liechti v. Roche*, 198 F.2d 174 (5th Cir. 1952) (translating Article 1644 as "He who by act or omission, causes damage to another because of his own fault or negligence, is obliged to repair the damage caused.").  Negligent products liability, in turn, is governed

---

Hr'g Tr.).  In turn, Dr. Lee was an Alternate Justice of the Supreme Court  from 1996 until 2004.  An Alternate Justice is a practicing attorney appointed to be available to substitute for a judge who is on leave or otherwise unable to try a particular case, such as when a judge has a conflict of interest in a particular case.  (Jan. 8, 2008 Evidentiary Hr'g Tr.).  During 2004 and 2005, he served as an Associate Justice of the Court.  Both tenures were served in the Civil Chamber of the Court.

While both experts have excellent qualifications, Dr. Lee has superior experience in civil matters such as those at issue in this case.  In addition, his interpretation of Panamanian Law is consistent with my own reading of the various Panamanian regulations and statutes.  For these reasons, I have given greater weight to the opinions of Dr. Lee, Tensar's expert.

[19]

Pycsa does not dispute that the Panamanian tort regime is governed by these sections of the Civil Code and through special laws.  (*See generally,* Plaintiff's Opposition to Summary Judgment, DE 293; Jan. 8, 2008 Evidentiary Hr'g Tr.).

by Article 1652A, which provides:

> The manufacturer of products consumed by the public is answerable for the damage caused by his products, provided that there has been *dolus, culpa* or negligence.[20]

Both Article 1644 and 1652A require subjective liability.  At the time of the bridge collapse, there was no special law and no statute in the Panamanian Civil Code imposing objective liability on manufacturers of products.[21]  Thereafter, on August 4, 2006, the Panamanian government, in recognition that defective products from abroad were causing injuries to Panamanian citizens, enacted Article 1421-F recognizing a cause of action for strict products liability against foreign manufacturers, producers, and distributors. However, Article 46 of the Panamanian Constitution provides that "[t]he Laws do not have retroactive effect, except those of public order or of social interest whenever it is so stated in them."  (*See* Lee & Lopez Joint Aff., DE 300 at ¶ 35).  The parties agree that the Panamanian Legislature did not provide for Article 1421-F to be applied retroactively and, since the bridge collapse occurred on December 13, 2003, Article 1421-F is not applicable to this case.

Pycsa urges the Court to conclude that although there is no statute imposing strict liability on manufacturers of products, Panamanian Courts would recognize the claim under Article 13 of the Civil Code of the Republic of Panama.  Article 13 provides:

> Should there be no law that is exactly on point under controversy, the laws

---

[20]

Article 34 c defines *dolus* as the "willful intention to inflict injury on the person or the property of another," and distinguishes among three kinds of "culpa" or neglect: gross negligence ("grave *culpa*"); ordinary negligence ("*levis culpa*"); and, neglect ("*levissima culpa*").

[21]

Pycsa's experts, Dr. Quiros and Dr. Hoyos, agree that Panama's Civil Code did not contain any statutes or special laws allowing for strict products liability at the time of the incident. (*See generally* Hoyos and Quiros Joint Aff., DE 289 at ¶¶ 26-29).

> that regulate similar cases or issues shall be applied and, in their absence, the constitutional doctrine, the general rules of law, and custom, in general and in accordance with Christian morality.

*See also Herrera v. Tropigas de Panama, S.A.,* Judicial Register, December 1997, pp. 128-134.  To support the application of Article 13 to this claim, Dr. Hoyos offers two cases from the Panamanian Supreme Court in which a claim for strict liability was recognized.

*See Montonave Dorion, S.A. v. Maritime Authority of Panama and the Republic of Panama,* Administrative Chambers, 2002;  *Herrera v. Tropigas de Panama, S.A.,* Judicial Register, December 1997, pp. 128-134, Civil Chambers.  In turn, Dr. Lee points to three decisions from the Civil Chambers of the Supreme Court of Panama in which the Court specifically stated that strict liability is not a recognized cause of action under the Civil Code.  *See Toriba Chiari v. Ralph Grenauld Machore and the Republic of Panama*, Judicial Registry No. 11, 1972, p. 172; [name not provided], Judicial Registry, May 21, 1985, p. 43; [name not provided], Judicial Registry, September 11, 1983, p. 32.  As explained by both sides, these decisions are not binding precedent under the Panamanian Civil Code legal system. In discussing the precedential value of appellate decisions, Article 1162 of the Panamanian Judicial Code, Second Book, Civil Procedure, provides:

> The appeal has the principal purpose to correct the inferred parties' torts in the court resolutions that act as *res judicata*, which even without that circumstance could cause an irreversible or serious damage by the nature of those resolutions.
> The appeal has also the purpose to ... make uniform the national case law. Therefore, *three uniform decisions from the Supreme Court, as Appeal Court, about the same matter of law, constitute possible doctrine, and the judge could* apply this doctrine in analogous cases, which is not an impediment for the Court to change the doctrine when it erroneously judges precedent decisions.

(Emphasis added).  Given the conflicting authority, these cases do not represent *three uniform decisions* and are therefore not *possible doctrine.*  Moreover, the cases cited are

not factually on point or persuasive.  In light of the conflicting precedent and the experts'

testimony, I engage in the Article 13 analysis Pycsa has asked the Court to conduct.

The first step the analysis is to decide whether there are laws that regulate similar

cases or issues.  In this case, Article 1652A regulates similar cases or issues in that it

provides a cause of action for products liability.  (*See* Jan. 8, 2008 Evidentiary Hr'g Tr.).

Having so concluded, the inquiry ends, as Article 13 requires those laws that regulate

similar cases or issues be applied. Article 1652A  requires subjective liability, or

negligence.  A claim for strict liability, on the other hand, is based on objective liability.

Pycsa's claim of strict products liability, therefore, would not be recognized under

Panamanian law based on an Article 13 analysis.

The Panamanian laws discussed in this section exemplify the policy behind

Panamanian's Civil Code to construe its Civil Code strictly so that a Defendant is only liable

if there is a statute on point that provides a cause of action, or, if no statute of point, if the

claim can be recognized under the strict procedure set forth in Article 13.  (*See* Lee Aff.,

DE 69, Ex. D at ¶ 17). In addition, the laws evidence Panama's former public policy of

imposing liability on manufacturers of products only in situations where there is subjective

liability, or negligence.  This is in keeping with Panama's tort rule that objective liability is

an exception to the general rule and only imposed if there is a statute on point.  (*See* Lee

Aff*.,* DE 259 at ¶¶ 24, 31, 32).   Since there is no statute imposing objective liability in

products liability cases, and since Article 13 leads to the application of Article 1252A which

requires subjective liability, I conclude that Pycsa's claim of strict liability is not recognized

by Panamanian law.

### ii.    Georgia

A claim of strict products liability in Georgia is governed by Georgia Statute § 51-1-

11(b)(1), which provides that:

> [T]he manufacturer of any personal property sold as new property directly or through a dealer or any other person shall be liable in tort, irrespective of privity, to *any natural person* who may use, consume, or reasonably be affected by the property and who suffers injury to his person or property because the property when sold by the manufacturer was not merchantable and reasonably suited to the use intended, and its condition when sold is the proximate cause of the injury sustained.

Ga. Code. Ann. § 51-1-11(b)(1).  The purpose and policy underlying Georgia's rule is to protect natural persons from personal injury; Georgia's strict products liability statute does not protect corporations injured by defective products.  Therefore, under Georgia law, Count I of Pycsa's complaint does not set forth a valid cause of action.[22]

### iii.   Florida

In *West v. Caterpillar Tractor Co.,* 336 So.2d 80 (Fla. 1976), the Florida Supreme Court recognized strict products liability as a cause of action and adopted the theory of strict liability set forth in the Restatement (Second) of Torts § 402A.  *West*, 336 So.2d at 87; *Fla. Steel Corp. v. Whiting Corp.,* 677 F. Supp. 1140, 1142 (S.D. Fla. 1988).[23]  In

---

[22]

Pycsa admits that Georgia does not recognize its claim of strict products liability.  (*See* Response in Opposition to Summary Judgment, DE 293 at p. 34).

[23]

Section 402A provides:

> (1)  One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
> > (a) the seller is engaged in the business of selling such a product, and
> > (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
> (2) The rule stated in Subsection (1) applies although
> > (a) the seller has exercised all possible care in the preparation and sale of his product, and
> > (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

adopting § 402A, the Florida Supreme Court implicitly recognized that, as a matter of public policy, "a duty should be placed on manufacturers to warrant the safety of their products." *Fla. Steel Corp.,* 667 F. Supp. at 1144.  In discussing Florida's public policy behind its strict liability rules, this Court has previously noted that Florida courts recognize the important distinction between tort and contract theories of recovery, and that Florida law prohibits the recovery of purely economic losses in a tort action.  *Id.*  (citing *Affiliates for Evaluation v. Viasyn Corp.*, 500 So.2d 688 (Fla. 3d DCA 1987)).  Florida's policy in providing for strict liability is to protect consumers and users, including legal entities, from non-economic injuries caused by a product, regardless of whether the manufacturer or distributer exercised all possible care.[24]   *See id.*

### iv.    Section 6 (Restatement) Factors as Applied to Count I

In the final step of the conflict-of-laws analysis, I must evaluate the relevant contacts in light of the competing policy considerations discussed in § 6(2) in the context of the specific rule of law at issue.

### (a)    The needs of the interstate and international systems

The Restatement's Commentary "reminds courts that the resolution of a conflict-of-laws problem should 'further harmonious relations between states and … facilitate commercial intercourse between them.'"  *Cortes,* 177 F.3d at 1301 (citing Restat. 2d of Conflict of Laws, § 6 cmt. d.).  In this case, Plaintiff's claim for strict products liability

---

Restat. 2d of Torts, § 402A.

[24]

Tensar admits that "Florida law recognizes Pycsa's strict products liability theory pled in Count I of the Complaint."  (Motion for Summary Judgment, DE 277 at p. 17).  Tensar's argument that Florida's Economic Loss Rule bars recovery for this claim is discussed in section III.F of this Order.

is not recognized by either Georgia or Panama.  Therefore, only if I apply Florida law does

Plaintiff state a claim.  Although Florida's policy of protecting consumers and users from

non-economic damages caused by dangerous products will seemingly be advanced by

application of its laws, the Eleventh Circuit has held that "the purpose underlying Florida

law is to provide an adequate remedy for its *own* domiciliaries."  *Id.*  Therefore, "Florida ...

possesses no interest in compensating domiciliaries of other jurisdictions more richly than

they would receive in their own courts."  *Id.*  On the other hand, applying Florida law would

contravene Georgia's policy in as much as it would allow recovery by a legal entity, rather

than a natural person, against one of its citizens.  Application of Florida law also will

contravene Panama's policy of allowing recovery only when a statute recognizes the cause

of action, and by imposing objective liability in tort without a statute or special law on the

matter.  It will further contravene the Panamanian Legislature's policy decision not to make

the strict products liability cause of action retroactive.  This factor, therefore, weighs heavily

against the application of Florida law to this case, and is neutral as to the choice between

Panama and Georgia law.  Since neither Panama nor Georgia recognize the claim,

application of the laws of either jurisdiction  will not be disturb international comity.

### (b)    The relevant policies of the forum and basic policies underlying the particular field of law

The Eleventh Circuit has said that the § 6 analysis "turns in large part on the

balance of competing interests contemplated by sections 6(2)(b) and 6(2)(c)."  *Cortes,* 177

F.3d at 1299 (citing *Judge*, 908 F.2d at 1568 (11th Cir. 1990)).  The balance is done in

three steps: (1) the court identifies the particular rule of law to be applied by each

interested forum; (2) the court identifies the purposes or policies underlying each forum's

rule; and, (3) the court assesses the degree to which the purposes underlying each rule

52

would be furthered by the rule's application.  *Id.*  "As a general proposition, it is fitting that the state whose [policy] interests are most deeply affected should have its local law applied."  *Id.* (internal quotations omitted).

Having already addressed the first two steps, I turn to step three of the balance of the competing interests.  Here, I conclude that  applying Panamanian law to Count I will advance its policy of interpreting its Civil Code strictly, and its legislature's policy of not making the newly enacted strict products liability statute retroactive.  It will also advance its policy of making the imposition of "objective liability" an exception to its rule that the tort system is premised on the imposition of "subjective liability."  Since Georgia's public policy on strict liability causes of action for products liability is to protect natural individuals from personal injury, and it does not seek to protect corporations from economic damages, application of Panamanian law will not conflict with Georgia's policy as Pycsa will not be able to bring a strict products liability cause of action under Georgia law.  Moreover, application of Panamanian law will not contravene Florida's policy either because Florida's seeming interest in having its laws applied is actually non-existent: Florida has no interest in rewarding domiciliaries of other jurisdictions more richly than they would receive in their own courts.  *See Cortes,* 177 F.3d at 1301.

Similarly, application of Georgia law, while it advances its public policy, does not conflict with the policies of Panama or Florida.  As to Panama, since neither jurisdiction recognizes the claim, the outcome will be the same.  Likewise, since Florida does not have an interest in rewarding a Panamanian corporation more richly than Panama would, application of Georgia law does not hinder Florida's public policy.

On the other hand, application of Florida law would contravene Georgia's public policy by awarding Pycsa – a corporation – economic damages.  It would also contravene

Panama's policy by imposing objective liability to reward a Panamanian corporation although Panama's civil code does not recognize the claim.   For these reasons, Georgia and Panama's interest in having their laws applied are paramount to Florida's interest.  As to them, since application of either forum's law leads to the same result, I find that this factor does not favor either of the sovereigns.

### (c)     Ease in the determination and application of the law to be applied

The parties are in agreement that the determination and application of Panama law is more difficult than the determination and application of Georgia law.  I also agree.  The Panamanian legal system is a civil law system and does not recognize the concept of "precedent" crucial to the American legal system.  In deciding a case, Panamanian judges look to the relevant provision in the Panama Civil Code and apply the facts to its text. Under the Civil Code, case law is not controlling.  *See* Article 1162, Panamanian Judicial Code, 2d Book, Civ. P. (discussing the non-precedential value of court opinions); Lee Aff., DE 259 at ¶ 11.  The parties in this case have submitted contradicting Panamanian law experts' affidavits and I have limited resources available to determine Panamanian law as it relates to all the issues before me.  Nonetheless, the parties have supplied the Court with translations of all relevant sections of the Panamanian Civil Code and special laws, and I held a day-long evidentiary hearing to discuss the conflicting affidavits.

On the other hand, as a federal court often sitting in diversity in Florida, I have experience in researching, analyzing and applying Florida law.  Likewise, it is easier to research and apply Georgia law than Panamanian law since Georgia, like Florida, adheres to the theory of binding precedent.  While Florida law might be slightly easier to apply than Georgia law, I find this slight difference to be of no consequence in light of the more significant contacts of the other interested sovereigns. Therefore, this factor slightly favors

the application of Florida or Georgia law to this matter.

    **(d)**    **Evaluation of Relevant Contacts and Policy Considerations**

Taking these factors into consideration, I conclude that Florida is the jurisdiction with the least significant contacts and the least interest in having its strict products liability rules applied to the controversy at hand. First, neither the injury or the conduct causing injury occurred in Florida. Second, while both parties conducted business in the State of Florida, Pycsa's place of incorporation and principal place of business is Panama, and Tensar is incorporated and has its principal place of business in Georgia. *See Cortes,* 177 F.3d at 1298 ("We agree that a party's principal place of business ordinarily should be afforded more weight than a jurisdiction in which the party has only business interests..."). Moreover, application of Florida law will conflict with the policies of Panama and Georgia, as discussed above.

I further conclude that while Panama and Georgia have significant interests in having their laws apply, Panama has a greater interest in that it is both the place where the injury occurred, and the place where a significant amount of the conduct causing injury occurred. *See Telemundo,* 485 F.3d at 1240-41 (discussing the importance of the place where the conduct causing injury occurred); *Bishop*, 389 So.2d at 1001 (stating the place of injury is often determinative in a conflict-of-laws analysis). As to the place where the conduct causing injury occurred, the undisputed record evidence is that part occurred in Georgia, and part in Panama. (*See* discussion in Section III.A.1of this Order).

As discussed in *Telemundo* and the commentary to § 145, the place where the conduct occurred is important in this case because some of "the defendant's conduct and the resulting injury occurred in different states." Restat. 2d of Conflict of Laws, cmt. 2(e); *Telemundo*, 485 F.3d at 1240-1241 (discussing the importance of the Restatement's

commentary and of the place where the conduct occurred in certain cases).  However, unlike *Telemundo*, this is not a case in which the place where the conduct occurred is the "single most important contact" according to § 145's commentary.  *Telemundo*, 485 F.3d at 1241.  On the other hand, the place where the injury occurred, which in this case is undisputably Panama, is often a determinative factor in tort cases, and my analysis did not reveal any special circumstances to conclude that the laws of the sovereign where the injury occurred should not be applied to the case.  *Cf. State Farm Mut. Auto. Ins. Co. v. Olsen,* 406 So. 2d 1109, 1110 (Fla. 1981) (discussing how the Restatement "does not reject the 'place of injury' rule completely" and "acknowledging that the state where the injury occurred would, under most circumstances, be the decisive consideration in determining the applicable choice of law.").  Therefore, having considered all of the Restatement factors and significant contacts, the balance strongly tips in favor of the application of the laws of Panama.

**C.   Application of Panamanian Law to Plaintiff's Claim for Strict Liability**

In summary, I have determined that Panama is the jurisdiction with the most significant contacts in connection with this claim, and it is the jurisdiction with the paramount interest in having its laws applied.  Panama did not recognize a strict products liability claim at the time of the incident.  In addition, an Article 13 analysis results in the application of Article 1652A of the Panamanian Civil Code to this claim.  Article 1652A, in turn, requires subjective liability.  Therefore, Count I, seeking to impose objective liability while admitting that there is no Civil Code provision or special law creating such liability, fails and Defendant is entitled to summary judgment as to Count I of the Complaint.

I further note that Georgia, the jurisdiction with the second most significant contacts, also does not recognize a claim of strict products liability under the facts of this case. There

is no dispute that since Plaintiff in this case **is not a natural person**, its strict products liability count is not recognized by Georgia law. *See Mike Bajalia, Inc. v. Amos Constr. Co.,* 142 Ga. App. 225, 226 (Ga. Ct. App. 1977) ("Strict liability is applicable only in actions by natural persons."). Therefore, even if Georgia law applied, the result would be the same. For these reasons, Defendant is granted summary judgment as to Count I of Plaintiff's Complaint.

**D.     Choice-of-Law Analysis for Plaintiff's Claim of Negligence**

Having determined that summary judgment must be entered in favor of Tensar as to Pycsa's claim of strict products liability, I now turn to Pycsa's claim of negligence as pled in Count II of its Complaint.  The issues raised by Count II are complicated and require a general discussion before I analyze the specifics of the laws of Panama, Georgia and Florida.  This introduction is meant to provide an overview of the various issues that I must address in order to determine whether Tensar is entitled to summary judgment on this count.  Although the introduction may be repetitive of the specific discussion, I feel that a detailed road map of this section of the Order is necessary due to the numerous complicated issues Count II raises, specially since the negligence count will be discussed under the laws of all interested jurisdictions.

**1.     Overview of Issues on Count II**

Having reviewed the allegations set forth in the Complaint, I conclude that Pycsa's claim is one for products liability.  However, for purposes of a complete discussion, I will address the claim of negligence as one for simple negligence as well.

**i.     Count II Construed as a Claim for Products Liability**

As a preliminary matter, I characterize Count II as a claim for negligent products liability.  Florida and Georgia law recognize a claim for products liability as pled in Pycsa's

complaint, and the laws of these jurisdictions are not in conflict.  Moreover, Florida and

Georgia recognize a claim for products liability against the manufacturer of component

parts. *See Houdaille Indus., Inc. v. Edwards,* 374 So. 2d 490, 493 (Fla. 1979);

*Scheman-Gonzalez v. Saber Mfg. Co.*, 816 So. 2d 1133, 1140 (Fla. 4th DCA 2002); *Hall

v. Scott U.S.A.,* 400 S.E.2d 700, 703 (Ga. App. 1990).

Regarding Panamanian Law, the Panamanian Civil Code has a general negligence

statute, as well as a specific statute that applies to products liability. (*See* Hoyos & Quiros

Aff.,DE 289 at ¶¶ 31-35).   Article 1644, the general negligence statute, provides that

"[w]hoever by action or omission causes harm to another, with *culpa* or negligence

intervening, has the obligation to make reparation for the harm caused." Civil Code of

Republic of Panama, Article 1644; *see also Liechti*, 198 F.2d at 174.  On the other hand,

Article 1652A of the Civil Code governs products liability causes of action.  *See* Civil Code

of Republic of Panama, Article 1652A ("The manufacturer of products consumed by the

public is answerable for the damage caused by his products, provided that there has been

*dolus, culpa* or negligence.").  Pursuant to Article 14 of the Civil Code, which provides that

a specific or "special" law must be given preference over a general law,[25] I conclude that

---

[25]

Article 14 provides:

> If in the codes of the Republic there should exist some provisions which are
> incompatible with each other, the following rules shall be observed in
> applying the same:
> 1.    The provision relative to a special issue, or to particular cases or
>       matters, has preference over one of a general nature.
> 2.    When the provisions have one and the same special or general
>       nature and are found in the same Code, preference shall be given to
>       the provision set forth in the later article; and if they should be in
>       different codes or laws, preference shall be given to the provision of
>       the Code or special law on the matter at issue.

Article 1652A applies to Count II since it is the specific statute recognizing products liability causes of action.  Unlike the laws of Florida and Georgia, Article 1652A does not recognize a cause of action for products liability against manufacturers of **component parts**. (*See* Lee Aff., DE 69, Ex. D at ¶ 21).  Therefore, Count II presents a true conflict: Georgia and Florida law recognize a claim for products liability against the manufacturer of component parts, but Panamanian law does not.  As a result of the conflict among the laws of the interested jurisdictions, I, again, conduct the Restatement's two-pronged choice-of-law analysis and conclude that Panama is the jurisdiction with the most significant contacts in this case.  Since it is undisputed that Tensar is a manufacturer of component parts, Tensar is entitled to summary judgment as to Count II of the Complaint.

### ii.  Alternatively, Count II Construed as a Claim for Simple Negligence

In the alternative, if I construe Count II as a claim for simple negligence, Article 1644 of the Panamanian Civil Code, which governs claims of general negligence, applies. Article 1644 is not in conflict with the law of negligence in Florida and Georgia since all three jurisdictions require that the Plaintiff  prove duty, breach, causation and damages. Under this scenario, there is only a false conflict as to Count II of Pycsa's Complaint and Florida law applies.[26]  Nonetheless, under Florida law, Pycsa's negligence claim fails

---

Civil Code of the Republic of Panama, Article 14.

[26] In Florida and Georgia, the elements supporting a cause of action for negligence are: (1) the existence of a legal duty; (2) a breach of that duty; (3) an injury proximately caused by the breach; and, (4) damages.  *See Fla. Dep't of Corr. v. Abril*, 969 So. 2d 201 (Fla. 2007) ("To maintain an action for negligence, a plaintiff must establish that the defendant owed a duty, that the defendant breached that duty, and that this breach caused the plaintiff damages."); *Johnson v. Am. Nat'l Red Cross*, 276 Ga. 270, 271 (Ga. 2003) ("It is well established that to recover for injuries caused by another's negligence, a plaintiff must show four elements: a duty, a breach of that duty, causation and damages.").

because Florida's Economic Loss Rule bars recovery of purely economic damages absent personal injury or damage to other property; and Pycsa has suffered neither. First, as was decided in my Order Denying Tensar's Motion to Dismiss, Pycsa has not suffered any personal injury and may not assert the claims of the individuals that were killed by the failure of the retaining wall. (*See* DE 75 at pp. 9-10). Second, the only property arguably separate and apart from the defective product itself is the adjoining roads and the non-defective bridge abutments. As to the adjoining roads, Pycsa has not submitted any evidence on summary judgment to establish that it owned this property; in fact Pycsa's representative has testified that the adjoining roads and culverts are owned by the Panamanian Government. (*See* Delgado Depo., DE 267, 78: 8-13). In turn, even if damage to the non-defective Mesa Wall Systems and the cost of repairing the damaged roadways fit within the "other property" exception of the economic loss rule, this property and damages belong to Vial. Thus, it is necessary to review the purported assignment of damages from Vial to Pycsa. As will be explained below, the purported assignment of damages fails for lack of consideration. Without a proper assignment, Pycsa may not assert Vial's damages to "other property." Therefore, if Count II is analyzed as a claim of simple negligence, Pycsa cannot prove the element of damages, and its claim fails under the laws of all interested jurisdictions.[27]

Finally, if Pycsa is correct that the assignment is valid, then its claim is one arising under the contract between Tensar and Vial, and per the Forum Selection Clause found in the back of the Tensar invoices, Georgia law applies. Here, a valid assignment results

---

[27]

In the section discussing Florida's Economic Loss Rule I will also address the issues related to Vial's purported assignment of its damages to Pycsa.

in Pycsa standing in the shoes of Vial as to claims arising out of the sale of Tensar's component parts; and any defenses Tensar could have asserted against Vial, it might assert against Pycsa.[28]   Under Georgia's Uniform Commercial Code, the terms and limitations of liability printed in the back of Tensar's invoices, titled "Conditions of Sale," are incorporated into the agreement for the sale of Tensar's component parts to Vial.  *See* O.C.G.A. § 11-2-207.  Per the various terms and conditions, Tensar is liable for loss or damage to any third party, and Vial must indemnity Tensar from and against all claims for damages by third-parties.  In addition, the "Conditions of Sale" required that Vial carefully examine the products shipped and inform Tensar, within two days of receipt, of any defects in the product; failure to give notice discharges Tensar from any liability.  The "limited warranty" provided states that the Seller warrants that the Products supplied will be of good and workmanlike quality manufactured in accordance with applicable specifications, and that the limited warranty is in lieu of all other warranties, expressed or implied.  Finally, under the additional terms, Tensar cannot be liable for any consequential or incidental damages; and, if the Product does not conform to the provisions of the limited warranty, or if Tensar is liable as a result of the sale, handling or use of the Product, Vial's *exclusive remedy* is the repayment of the purchase price or, at the Seller's option, replacement of the non-conforming goods. If the assignment was valid as Pycsa argues, then it assumed all of Vial's responsibilities under the terms of the agreement, and is subject to the all of the warranty limitations provided by these terms.  Pursuant to these terms, Pycsa's claim completely fails because Vial's failure to give notice of any defects in the product, including

---

[28] At the Jan. 18, 2008 hearing, Pycsa's counsel conceded this point. (*See* Jan. 18, 2008 Hr'g Tr.).

its failure to inform Tensar that the wrong component parts were shipped, absolves Tensar of any and all liability.  In addition, Pycsa's claims seeking to recover consequential or incidental damages fail.  Assuming that Georgia Law applies and that the assignment is valid, even if Pycsa is somehow excused from its obligation to give notice of the non-conforming goods, per the Conditions of Sale, Pycsa may only, at best, recover the cost of the purchase price, or receive conforming goods.  Having provided this overview of the issues related to Pycsa's count of negligence, I now turn to a more complete discussion of these matters.

**2.      Characterization of the Negligence Claim**

In Count II, Pycsa purports to allege a claim for negligence.  Specifically, Pycsa alleges that Tensar was negligent in, but not limited to, the following: (1) failure to design and manufacture the component parts of the Tensar Mesa Wall so as not to collapse; (2) failure to provide the appropriate Tensar components as indicated on the Tensar stamped plans for the Tensar Mesa Wall System; (3) failure to study, investigate, ascertain, impose or comply with reasonable standards and regulations to protect the person and property of those interacting with the Tensar Mesa Wall System; (4) failure to design, manufacture and implement the Tensar Mesa Wall System to be free of defects; and, (5) failure to test the implemented components of the Tensar Mesa Wall System to determine their safety and fitness for the task.  (*See* Compl., Count II, ¶ 92).   Despite the long history of this case, and its numerous pleadings, there still seems to be a dispute as to how to interpret Count II of the Complaint.  On the one hand, the allegations in the complaint may be construed to allege a claim for negligent products liability, such as negligent design and manufacturing.  However, in its Response to Summary Judgement and related pleadings,

Pycsa has repeatedly stated that it was **not** asserting such a claim.  Instead, it argues that Count II is for "Common Law General Negligence."

A preliminary step in any choice-of-law analysis is the characterization of the legal issue to determine whether it sounds in tort or the like. *Telemundo,* 485 F.3d at 1240 ("As a preliminary matter, the court must characterize the legal issue and determine whether it sounds in torts, contracts, property law, etc.").  This characterization will guide the Court in determining which choice-of-law rule applies to the controversy at hand – i.e. the significant relationship test or *lex loci contractus*. *Id.*  Once the court determines that the causes of actions sound in tort, the court must further characterize the nature of the alleged tort in order to apply the specific choice-of-law principles under the Restatement and its commentary to each issue in the case.  *See generally Telemundo,* 485 F.3d at 1240-1241 (after characterizing the action as a "tort" claim, the court further characterized the nature of the tort as one of "misappropriation of trade values," and reviewed the appropriate commentary to the Restatement); *Emmart v. Piper Aircraft Corp.*, 659 F. Supp. 843, 846-47 (S.D. Fla. 1987) (conducting the choice-of-law analysis on an issue-by-issue basis); *see also* Restat 2d of Conflict of Laws, § 7 (stating that characterization of a claim involves "classification of a given factual situation under the appropriate legal categories *and* specific rules of law) (emphasis added).

Here, while Pycsa endeavors to characterize its negligence claim as being one for simple negligence, the crux of its alleged breaches and duty are premised upon products liability: Pycsa is suing the manufacturer of component parts of the Mesa Wall System, and the allegations set forth in its Complaint explicitly state that Tensar failed to *design, manufacture and implement* the Mesa Wall System and its component parts. For example,

63

Pycsa alleges that:

> This action is to recover for an unreasonably dangerous and faulty retaining wall system sold by Tensar called the Tensar Mesa retaining wall system. Even if Tensar's components had not been faulty and improperly implemented, the Tensar Mesa retaining wall system *designed* and sold by Tensar was wholly insufficient for the intended purposes.

(Compl. at ¶ 5) (emphasis added).  In pleading its negligence claim, Pycsa alleges the following:

> Tensar had a duty to ensure that the Tensar Mesa retaining wall system it *designed* would be *reasonably safe* for its intended use and would not cause harm to Pycsa, the project or the public. (Compl. at ¶ 90) (emphasis added).

> Tensar knew, or should have known,... that *the design of the Tensar Mesa retaining wall system* as implemented would cause severe damage because of *negligent manufacturing components, negligent design implementation, negligent implementation* by Tensar's exclusive agent and the resulting *defects and deficiencies*. (Compl. at ¶ 91) (emphasis added).

> Tensar breached its duty when it *negligently manufactured and designed* the Tensar Mesa retaining wall system... (Compl. at ¶ 93) (emphasis added).

> The *defective design and implementation* of the Tensar Mesa retaining wall system were the direct and proximate cause of the extensive damages suffered by Pycsa... (Compl. at ¶ 94) (emphasis added).

In light of the unambiguous allegations plead in Count II, I conclude that Pycsa's claim must be construed as a claim for negligent products liability based on negligent design and manufacturing of the Mesa Wall System and its component parts.[29]  Pycsa's

---

[29]

I also note that there is no record evidence on summary judgment to support a claim that the **entire** Mesa Wall System, in and of itself, was defective.  Contrary to such allegation, the record evidence is that the design of the Mesa Wall System has been implemented in numerous projects for several years without any problems.  The record evidence also shows that Tensar did not manufacture all components of the entire system, so a claim for negligent manufacturing of the entire wall fails. In addition, any claim as to the negligent manufacturing of the blocks must be dismissed because the undisputed record evidence is that the blocks were manufactured by Multiblock, a Panamanian company, and not by Tensar.  The record evidence on summary judgment is that the only component part

attempts to interpose new allegations and legal theories into Count II of its Complaint through subsequent pleadings and argument are improper.  Allowing Pycsa to do so would make the procedures for a formal amendment of a complaint set forth in the Federal Rules meaningless.  *See Southwick Clothing LLC v. GFT (USA) Corp.,* NO. 99-10452, 2004 U.S. Dist. LEXIS 25336 (S.D.N.Y. Dec. 14, 2004) ("A complaint cannot be amended merely by raising new facts and theories in plaintiffs' opposition papers, and hence such new allegations and claims should not be considered in resolving the motion" for summary judgment.)*; Thyssen Elevator Co. v. Drayton-Bryan Co.,* 106 F. Supp. 2d 1355, 1361 (S.D. Ga. 2000) ("A party is normally bound by facts asserted in a pleading.") (citing *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 528 (2d Cir.1985)).  Accordingly, I limit my characterization of the legal issue to what is alleged by Pycsa in Count II of its Complaint.

### 3.      The Laws of the Interested Jurisdictions are in Conflict

Florida and Georgia both recognize Pycsa's products liability claim as pled.[30]  In both jurisdictions, a product may be defective by virtue of a design defect, a manufacturing defect, or an inadequate warning.  *See Liggett Group, Inc. v. Davis*, 973 So. 2d 467 (Fla. 4th DCA 2007) ("A product may be defective by virtue of design defect, manufacturing

---

manufactured by Tensar are the geogrids.

[30]

The parties agree that Pycsa's negligence cause of action is recognized under the laws of Florida and Georgia as pled.  (*See* Reply, DE 307 at p. 11).  However, Tensar argues that it is nonetheless entitled to an entry of summary judgment because Pycsa has failed to show the required element of causation and because Pycsa cannot prove its entitlement to damages. I address the issue of damages in Section III.F of this order discussing Florida's Economic Loss Rule.  However, having concluded that summary judgment must be entered in favor of Tensar as to Count II of the Complaint for independent and dispositive reasons regardless of which law is applied, I need not, and do not, reach issues of causation.

defect, or an inadequate warning.") (citing *Jennings v. BIC Corp.*, 181 F.3d 1250, 1255 (11th Cir. 1999)); *Banks v. Ici Ams.*, 264 Ga. 732, 733 (Ga. 1994) ("There are three general categories of product defects: manufacturing defects, design defects, and marketing/packaging defects."). In addition, the laws of Georgia and Florida allow a person to sue the manufacturer of component parts under a products liability theory. *See Houdaille Indus., Inc. v. Edwards*, 374 So. 2d 490, 493 (Fla. 1979); *Scheman-Gonzalez v. Saber Mfg. Co.*, 816 So. 2d 1133, 1140 (Fla. 4th DCA 2002); *Hall v. Scott United States*, 400 S.E.2d 700, 703 (Ga. App. 1990).

As briefly mentioned above, the parties dispute whether Panamanian law conflicts with that of Georgia and Florida. The general negligence statute in the Panamanian Civil Code provides that: "Whoever by action or omission causes harm to another, with *culpa* or negligence intervening, has the obligation to make reparation for the harm caused." *See also Liechti*, 198 F.2d at 174 (translating Article 1644 as "He who by act or omission, causes damage to another because of his own fault or negligence, is obliged to repair the damage caused."). In 1992, the Panamanian Government enacted Article 1652A providing a negligent products liability cause of action. Article 1652A provides:

> The manufacturer of products consumed by the public is answerable for the damage caused by his products, provided that there has been *dolus, culpa* or negligence.

The Civil Code of Panama includes canons of interpretation in situations where, as here, more than one section of the Civil Code may apply. Specifically, Article 14 of the Civil Code, provides:

> If in the codes of the Republic there should exist some provisions which are incompatible with each other, the following rules shall be observed in applying the same:

66

1.    The provision relative to a special issue, or to particular cases or matters, has preference over one of a general nature.

2.    When the provisions have one and the same special or general nature and are found in the same Code, preference shall be given to the provision set forth in the later article; and if they should be in different codes or laws, preference shall be given to the provision of the Code or special law on the matter at issue.

Civil Code of the Republic of Panama, Article 14. The two sections of the Civil Code that the parties have argued are applicable to this case are Article 1644 governing negligence causes generally, and Article 1652A, which addresses products liability causes of action specifically.  (*See* Jan. 8, 2008 Evidentiary Hr'g Tr., Cross-Examination of Dr. Hoyos;  Lee Aff., DE 69, Ex. D ¶ 15).  In accordance with the Code's general cannons of construction, which Pycsa's experts agree Panamanian judges are bound to follow, *see* Hoyos & Quiros Aff., DE 289 at ¶ 21, the specific provision applies to this case.  (Lee Aff., DE 69, Ex. D ¶ 18).  Dr. Hoyo's opinion that both the general and the specific provision may be applied to Pycsa's claim is contrary to the plain and unambiguous language of Article 14.  (*See* Jan. 8, 2008 Evidentiary Hr'g Tr., Cross-Examination of Dr. Hoyos).  Thus, as the only provision in the Civil Code that governs products liability causes of action specifically, Article 1652A applies to Count II. (*Id.;* Lee & Lucas Joint Aff., DE 300 at ¶ 39-42).

Another canon of interpretation included in the Civil Code is Article 10, which provides that:

The words of the law shall be understood in their natural and obvious meaning, according to the general use of the words per se; but when the legislator has defined the term expressly for certain issues, in these cases they shall be given their legal meaning.

Article 10, Panamanian Civil Code.  Of particular interest in this case is Article 29 of Law 29 (Consumer's Protection Title), which defines "consumer" as a "[n]atural person or legal entity that acquires from a supplier *final goods* or services of any nature."  (emphasis

67

added).   Dr. Lee and Dr. Lopez have convincingly testified that the Third Superior Court of the First Judicial Circuit of Panama, which is the appellate court in consumer protection matters, has consistently applied this definition literally to claims arising under Article 1652A.  (*See* Lee & Lucas Joint Aff., DE 300 at ¶ 40).   Under this legal definition, Pycsa does not qualify as the type of "consumer" contemplated by Article 1652 because it did not obtain from Tensar any "final goods or services".   (Lee Aff., DE 259 at ¶ 23).   It is undisputed that Tensar manufactured component parts that were incorporated by others into a larger retaining wall.  Further, Pycsa does not allege that Tensar manufactured the retaining wall itself, which is the finished product in this case.  Therefore, since  Article 1652A only imputes liability to manufacturers of finished products, and since Tensar did not manufacture the finished product in this case, if Panamanian Law applies, Pycsa's claim of negligence as pled against Tensar fails.

Finding that Article 1652A is more restrictive than the laws of Florida and Georgia, in that it only protects consumers of finished products, I will engage in the two-pronged inquiry delineated in the Restatement (Second) of Conflict of Laws.  Although most of the inquiry is identical to the matters discussed in connection with the strict liability claim, and as such the discussion above applies to this section, I must conduct the Restatement's analysis in the context of each rule of law at issue in the case. *See generally Emmart*,  659 F. Supp. at 846-47 (conducting the choice-of-law analysis on an issue-by-issue basis).

### i.    Significant Contacts Under § 145

As discussed in Section III.B.1 of this Order, Panama and Georgia are the jurisdictions with the most significant contacts.   In fact, all four factors of the Restatement favor the application of Panamanian law: (1) Pycsa, Vial, and Funsa are incorporated and

have their principal place of business in Panama; (2) the injury occurred in Panama; (3) part of the conduct causing injury occurred in Panama; and, (4) the relationship among the parties was centered, in part, in Panama.  In its negligent count, Pycsa alleges that the conduct causing the injury was the design and manufacturing of the retaining walls and its component parts, and the failure to provide the appropriate component parts as indicated on the stamped plans.  (*See* Compl. at ¶ 92).  As discussed in section III.A.1.i above, it is undisputed that: (1) at least some of the design drawings and calculations for the retaining walls were prepared in Panama; (2) the final design drawings and calculations were sealed and signed by Funsa's engineer in Panama;[31] (3) the alleged defective 'blocks' were manufactured in Panama by a Panamanian company; (4) the construction – or "design implementation" – of the Tensar Wall System occurred in Panama; (5) the alleged defective component parts were shipped to Panama, and allegedly negligently used in the construction of the bridges in Panama; and, (6) Vial selected and supplied the backfill material, which is the reinforcing medium that engages the grid to support the structure, in Panama.  While Tensar's alleged failure to provide the appropriate component parts occurred in Georgia, Vial's failure to inspect the shipped goods and the engineer's failure to ensure that the parts received were in accordance with the plans occurred in Panama.

On the other hand, as discussed in connection with the strict liability claim, three of

---

[31] In Count II, Pycsa alleges that Tensar breached its duty when it negligently manufactured and designed the Tensar Mesa retaining wall system.  (Compl. at ¶ 93).  However, there is no allegation that high performance connectors, as the sealed plans called for, should not have been issued.  Rather, the crux of the argument is that Tensar was negligent in providing standard connectors which did not conform with the sealed plans.  As to this argument, it must be noted that the Vial purchase orders did not request "high performance connectors", that the Tensar invoices identified the parts shipped and billed for as "standard connectors", and that when Tensar shipped the standard connectors Vial ordered, the final plans had not been prepared.

the four relevant factors point to Georgia as a jurisdiction with a strong interest in having its laws applied: Tensar is incorporated and has its principal place of business in Georgia; some of the conduct causing injury occurred in Georgia (i.e. the design of the connectors and geogrids was done in Georgia, as was the overall design of the Mesa Wall System; the geogrids were manufactured in Georgia; Tensar shipped the component parts from Georgia; and, some of the design calculations for the bridge abutments were done by Tensar engineers in Georgia); and, the relationship between Vial and Tensar, and Pycsa and Tensar, was centered, in part, in Georgia. (*See* Section III.A.1.ii of this Order). Finally, Florida has the least interest in having its laws applied to the issue of negligence since it is not the place where there injury occurred, none of the alleged negligent acts occurred in Florida, and the relationship among the parties was not centered in Florida.

**ii.      Section 6 of the Restatement (Second) of Conflict of Laws**

As outlined in Section III.B.2, the next step in the choice-of-law analysis is to evaluate the relevant contacts in light of the competing policy considerations delineated in the § 6 of the Restatement. *See Telemundo*, 485 F.3d at 1242-1243.

Panama has a policy of construing its Civil Code strictly. (*See* Lee Aff., DE 69, Ex. D at ¶ 17).   In addition, words in its laws should be given their natural and obvious meanings, unless the legislature has expressly defined a term. *See* Civil Code, Article 10 (providing that if a term has been defined by the legislature, the legal definition should be applied when interpreting a statute containing such terms). Finally, Panama's products liability policy is to impose subjective liability on manufacturers of final goods or services, and not on manufacturers of component parts. Georgia and Florida, on the other hand, have a policy of imposing liability on manufacturers of final products and of component

parts based on negligent design or manufacturing.

(a)     **The needs of the interstate and international systems**

Plaintiff's claim for negligent products liability against a manufacturer of component parts is not recognized by Panamanian law.  While Florida and Georgia recognize the claim, plaintiff is not a domiciliary of either jurisdiction.  As was the case in the claim of strict liability, neither Georgia nor Florida have an "interest in compensating domiciliaries of other jurisdictions more richly than they would receive in their own courts." *Cortes,* 177 F.3d at 1301.  As the only jurisdiction whose policy would be advanced without disturbing international comity, this factor favors application of Panamanian law.

(b)     **The relevant policies of the forum and basic policies underlying the particular field of law**

The particular rule of law of Count II is negligent products liability.  Although the applicable section of the Civil Code of the Republic of Panama, Article 1652A, imposes liability on the manufacturer of products if there is guilt or negligence, which Pycsa alleges there is, Article 1652A does not recognize the claim as against manufacturers of component parts.  While Georgia and Florida recognize the claim against manufacturers of component parts, neither jurisdiction seeks to protect corporations from purely economic damages.  Moreover, as discussed above, neither Florida or Georgia have an interest in rewarding domiciliaries of other jurisdictions more richly than they would receive in their own courts.  Therefore, just as the previous factor, Panama's interest in having its laws applied is paramount in this matter.

(c)     **Ease in the determination and application of the law to be applied**

For the reasons discussed in section III.B.2.iv(c) of this Order, this factor slightly favors the application of Florida or Georgia law to this matter.

71

**(d) ___Evaluation of Relevant Contacts and Policy Considerations**

As with the claim of strict liability, I conclude that Florida is the jurisdiction with the least significant contacts and the least interest in having its negligent products liability rules applied to the controversy at hand.  While both Panama and Georgia have a strong interest in having their laws apply, the place of injury, in this case Panama, is often determinative in a conflict-of-laws analysis, and much of the alleged negligent conduct occurred in Panama.  *See* Section III.D.a.1 above.  My analysis did not reveal any special circumstances to conclude that the laws of the sovereign where the injury occurred should not be applied to the case.  *Cf. State Farm Mut. Auto. Ins. Co. v. Olsen,* 406 So. 2d 1109, 1110 (Fla. 1981) (discussing how the Restatement "does not reject the 'place of injury' rule completely" and "acknowledging that the state where the injury occurred would, under most circumstances, be the decisive consideration in determining the applicable choice of law."). Therefore, as the place where the injury occurred, the place where three of the four key players are incorporated and have their principal places of businesses, the place where the relationship among the parties is partly centered, and where a large amount of the injury causing conduct alleged in Count II took place, Panama law applies to this claim.

**E.    Application of Panamanian Law to Plaintiff's Negligence Claim**

Applying the legal definition found in Article 29 of Panamanian Law 29 (Consumer's Protection Title),  Article 1652A only imputes liability to manufacturers of finished products. *See* Article 29 of Law 29 (Consumer's Protection Title) (defining  "consumer" as a "[n]atural person or legal entity that acquires from a supplier *final goods* or services of any nature." (emphasis added)).   There is no dispute that: (1) Tensar only manufactured the geogrids of the subject Mesa Wall System; (2)  that the connectors were manufactured by an

unidentified third-party; (3) that the blocks were manufactured by and bought from Multiblock; and, (4) that the soil came from Panama.  Since Tensar did not manufacture any finished product consumed or used by Pycsa, Pycsa does not qualify as a "consumer" for purposes of Article 1652A.  As a result, Defendant is entitled to summary judgement as to Count II of the complaint in as much as it alleges a claim for products liability sounding in negligent design and manufacturing.[32]

## F.    Recovery of Economic Damages in Tort

Pycsa argues that its negligence claim should be liberally construed as a general claim of negligence rather than one arising under products liability.   As already discussed, Panama courts apply Article 1644 to general claims of negligence.   As to general negligence, the laws of Panama, Georgia, and Florida are not in conflict as each jurisdiction requires the plaintiff to prove the existence of a duty, a breach of that duty, and, that a result of the breach, the Plaintiff suffered damages.  *See supra* n. 26.  However, the inquiry does not end here.   The next question to be answered is whether the interested jurisdictions allow recovery of purely economic damages in tort.

As to Panama, Tensar argues that Panamanian law bars recovery of economic damages in a claim sounding in negligence.   Pycsa's experts, on the other hand, opine that while Panama has a dual track system where the parties can claim damages either in contract or tort,   nothing in the Panamanian legal system limits economic damages to

---

[32]

Because Panama law does not recognize a products liability claim against manufacturers of component parts, and because it is undisputed that Tensar is a manufacturer of component parts and that Tensar was not responsible for the final design of the bridge abutments, the dispute as to the extent of Tensar's role in the preliminary design of the bridge abutments does not defeat summary judgment.

contract causes of actions.  The parties' arguments confuse the issue.   As noted by Pycsa's experts, Article 1644a of the Panamanian Civil Code allows for economic damages caused by a person's negligence. (*See* Hoyos & Quiros Joint Aff., DE 344 at ¶ 4). However, the claims in this case arise from alleged duties imposed by a contractual relationship between Vial and Tensar – i.e. the sale of the allegedly defective component parts.  The issue thus becomes whether Panamanian law allows for the recovery of economic damages sought under a theory of negligence where the underlying facts arise out of a contractual relationship. It is this question that Tensar's experts convincingly answer in the negative.  Dr. Lee has explained that Articles 1644 through 1652A of the Panamanian Civil Code regulate extra-contractual causes of action, and Articles 1105 through 16288 regulate contract-based causes of actions. (Lee Aff., DE 338 at ¶ 6).  Under Panamanian Law, a party may not bring a tort based claim when the conduct is contractual in nature.  (*Id.* at ¶ 7).   Therefore, economic damages arising out of a contractual relationship, as here, may not be recovered under a tort based theory of liability.

Like Panamanian law, Georgia courts have applied their rendition of the economic loss rule[33] to bar recovery in tort for purely economic losses. *See Squish La Fish v. Thomco Speciality Products,* 149 F.3d 1288, 1291 (11th Cir. 1998).[34]  "Absent personal injury or

---

[33]

The purpose of Georgia's economic loss rule is not to allow a plaintiff to sue merely to recover the benefit of his bargain.  *Id.* (citing *Vulcan Materials Co. v. Driltech*, 306 S.E.2d 253, 257 (Ga. 1983)).   Thus, under the rule, a plaintiff may only recover economic damages arising out of a contractual relationship if it has suffered "an independent injury over and above the mere disappointment of plaintiff's hope to receive his contracted for benefit." *Id.* (citing *Orkin Exterminating Co. v. Stevens*, 203 S.E.2d 587, 589 (Ga. App.1973)).

[34]

Georgia law does recognize a tort claim for misfeasance in the performance of a contractual duty, such as Tensar's alleged failure to ship the appropriate component parts.

damage to property other than to the allegedly defective product itself an action in negligence does not lie and any such cause of action may be brought only as a contract warranty action." *Id.* at 1291 (quoting *Advanced Drainage Systems, Inc. v. Lowman*, 437 S.E.2d 604, 607 (Ga. App. 1993)).   In addition to the personal injury and damage to other property exceptions, Georgia court recognize what is called the "accident exception." *Flintkote Co.*, 678 F.2d at 945.   Under the accident exception, a party may recover for damages to the defective product itself when the injury resulted from an accident.  *Id.* at 948. If a plaintiff's claim falls under the accident exception, the only recovery allowed is the value of the damaged product itself and not all economic damages suffered as a result of the accident.  *See generally Gainous v. Cessna Aircraft Co.,* 491 F. Supp. 1345 (N.D. Ga. 1980)*.*  Finally, section 51-1-11 of the Official Code of Georgia provides that

> no privity is necessary to support a tort action; but, if the tort results from the violation of a duty which is itself the consequence of a contract, the right of action is confined to the parties and those in privity to that contract, except in cases where the party would have a right of action for the injury done independently of the contract...

O.C.G. § 51-1-11(a).  Thus, Georgia law prevents a plainitff from recovering in tort for the failure to perform contractual obligations if that plaintiff is not in privity of contract with the defendant and the claimed damages are merely economic.  *See Carolina Cas. Ins. Co. v. R.L. Brown & Assocs.,* Case No. 04-3537, 2006 U.S. Dist. LEXIS 89412, 15-16 (N.D. Ga. Dec. 11 2006) (stating that Georgia law does not allow negligence claims where "there is a lack of  privity between the parties and the alleged negligence was neither inherently dangerous, caused personal injury, nor caused property damage...").   It is undisputed in

---

*Flintkote Co. v. Dravo Corp.*, 678 F.2d 942, 945  (11th Cir. 1982) (applying Georgia law). However, Pycsa has not pled such a claim, and the economic loss rule would bar recovery in this case.

this case that Tensar and Pycsa are not in privity of contract.  In addition, as discussed more thoroughly below, Pycsa cannot avail itself of the personal injury or other property exception.  The only question that remains is whether this case falls under the accident exception.

"Accident" for purposes of the exception is defined as: "a sudden and calamitous event which, although it may only cause damage to the defective product itself, poses an unreasonable risk of injury to other persons or property."  *Busbee v. Chrysler Corp.*, 524 S.E.2d 539, 541 (Ga. App. 1999) (quoting *Vulcan Materials Co. v. Driltech, Inc.*, 306 S.E.2d 253, 257 (Ga. 1983)).  On the other hand, the gradual deterioration of a product is not an "accident" for purposes of the rule.  *See Vulcan*, 306 S.E.2d at 254 (approving the holding in *Long v. Jim Letts Olds.*, 217 S.E.2d 602 (Ga. App. 1975), in which the court rejected the application of the accident exception when the plaintiff's automobile engine overheated as a result of gradual deterioration and caused the purchaser to sell the automobile for less than the book value.); *Gainous,* 491 F. Supp. at 1346 ("Thus, where an alleged defect resulted in deterioration of the product itself, the Georgia court did not allow recovery, terming this an economic loss only.").  The wall collapse in this case was not a sudden accident.  Instead, the undisputed record evidence is that the collapse of the retaining wall was the result of a slow deterioration of the soil and wall conditions for a period of approximately eight months.  *See* Barrera Depo., DE 262, pp. 281-282; Nova-Roessing Depo., DE 291, pp. 92-93.  Moreover, Pycsa was aware of the wall's deterioration, as it is undisputed that following initial reports of a crack in the walls, Pycsa asked Funsa for reassurances.  Thus, Pycsa cannot avail itself of the 'accident exception' to Georgia's economic loss rule.

Florida courts also recognize the economic loss rule. As explained in my December 18, 2006 Order Denying Defendant's Motion to Dismiss ("Dec. 18 Order", DE 75), Florida's economic loss rule is a common law doctrine recognized by Florida courts which prohibits recovery in tort in certain situations of purely economic damages. *Indem. Ins. of N. Am. Aviation, Inc. v. Am. Aviation,* 891 So. 2d 532 (Fla. 2004). Under the rule, the damage at issue must be only to the product itself: no personal injuries may be involved, and no additional property damage. *Id.* The Florida economic loss rule applies in two limited circumstances: (1) where the parties are in contractual privity, such that the plaintiff may find a remedy through contract; and, (2) where a plaintiff brings suit against a distributor or manufacturer in products liability, where the plaintiff may find relief through a warranty action. *Id.* Thus, the economic loss rule applies in products liability cases, such as this one, where the parties are not in contractual privity, and acts as a bar to recovery of purely economic damages.

In denying Tensar's Motion to Dismiss, I concluded that "because Pycsa suffered no personal injury, it is not in a position to assert the claims of the individuals that were killed by the failure of the retaining wall, and cannot avail itself of that exception to the economic loss rule." (*See* DE 75 at pp. 9-10). At that time, "[g]iven the strict standards for dismissal ... [and] based on the pleadings," I concluded that the "other property" exception may apply. At the summary judgment stage, considering the undisputed record evidence and construing all inferences in favor of Pycsa, I now conclude that Pycsa has not suffered any damage to "other property" and, if Florida law applies to Count II, the economic loss rule bars recovery. In order to reach this conclusion I have considered the specific damages sought by Pycsa and have analyzed the validity of the purported assignment of

damages from Vial to Pycsa.  As to the issue of damages, I find no clear conflict among the laws of the interested jurisdictions.  Should Count II be construed as one for simple negligence as Pycsa argues, Florida law applies, *see Tune,* 766 So. 2d at 352, and recovery under Count II is not permitted.

## 1.      Damages Sought

In this lawsuit, Pycsa seeks $44,751,096 plus interest in damages.  (*See* Argiz Suppl. Expert Report, DE 179).   Specifically, Pycsa seeks:

1.      Demolition Costs of the Martin Luther King, La Palmita and La Fula retaining walls which used the Tensar Mesa retaining wall system;

2.      Reconstruction costs of the Martin Luther King, La Palmita and La Fula retaining wall systems using a different retaining wall system;

3.      Additional Equipment costs;

4.      Right of way acquisition costs;

5.      Interest cost during delay;

6.      Additional cost of materials;

7.      Lost profits.

(*Id.*).

## 2.      Assignment of Damages

On June 26, 2007, Vial assigned its "extraordinary expenses" incurred following the wall collapse to Pycsa.  The assignment states, in part, that "[t]he assignor [Vial] by means of this contract assigns irrevocably, **free of charge** in favor of the assignee [Pycsa], all rights with the purpose of collecting the extraordinary expenses incurred in the demolition and construction of the walls and bridges of La Palmita, La Fula and Martin Luther King

78

and the Phase II of the Northern Corridor." (DE 292, Ex. 16) (emphasis added).  Without the assignment, Pycsa cannot claim damages related to equipment and vehicles owned by Vial that were utilized in the construction of the road and which allegedly sat idle during the three-years delay period; demolition costs incurred by Vial; nor the escalation in price of construction materials, including concrete, diesel, base layer material and steel, purchased by Vial.

In all of the interested jurisdictions, an assignment is considered a contract and, as such, requires consideration, or "cause", to be valid.  When determining which law applies to contracts, Florida adheres to the *lex loci contractus* rule, so that the contract is governed by the law of the place where the contract was executed.  *State Farm Mut. Auto. Ins. Co. v. Roach*, 945 So. 2d 1160, 1162-1163 (Fla. 2006).  In this case, the assignment was executed in Panama and, as such, is governed by Panamanian law.  Under Panamanian law, there can be no contract where an agreement lacks consideration or cause.  *See* Article 1112, Civil Code of Panama ("There is no contract, but when the following requirements are met... cause of the obligation stipulated."); Article 1126, Civil Code of Panama ("The contracts with no cause ... do not produce any effect."); *see also* Lee Aff., DE 259 at ¶¶ 37-42.  The clear and unambiguous terms of the assignment state that this contract was "free of charge."  As such, the contract lacks consideration and fails under the laws of Panama.[35]  Because the assignment is invalid, Pycsa cannot claim those damages

---

[35] A contract without consideration would also fail under the laws of Florida and Georgia. *See Global Travel Mktg., Inc. v. Shea*, 908 So. 2d 392, 398 (Fla. 2005) (stating that lack of consideration is a defense to contract formation); *Hogan v. Supreme Camp of Am. Woodmen,* 146 Fla. 413, 416 (Fla. 1941) ("A valid contract requires both capacity of the parties and consideration."); *Giles v. Sun Bank, N.A.,* 450 So. 2d 258, 260 (Fla. 5th DCA

incurred by Vial, including the demolition costs and damages to the non-defective Tensar Mesa retaining wall systems.

### 3.   Application of the Florida Economic Loss Rule to Count II

The U.S. Supreme Court, in *East River Steamship Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 106 S. Ct. 2295, 90 L. Ed. 2d 865 (1986), held that a manufacturer does not have a tort-based duty "to prevent a product from injuring itself;...damage to a product itself is most naturally understood as a warranty claim." *See id.* 106 S. Ct. at 2302-03.  In *Florida Power & Light Co. v. Westinghouse Electric Corp.,* 510 So. 2d 899, 900 (Fla. 1987)*,* the Florida Supreme Court adopted *East River's* reasoning and held that a plaintiff cannot recover for the failed performance of a product, and that the appropriate remedies for such failures, absent personal or property injury, is provided by contract and warranty law.  *See id.* at 901.  *Florida Power* approved the holding of several Florida District Court's of Appeals, including *Monsanto Agricultural Products v. Edenfield*, 426 So. 2d 574 (1st DCA 1982), in which the court stated:

> Tort law imposes upon manufacturers a duty to exercise reasonable care so that the products they place in the marketplace will not harm persons or property. However, tort law does not impose any duty to manufacture only such products as will meet the economic expectations of purchasers. Such a duty does, of course, exist where the manufacturer assumes the duty as part of his bargain with the purchaser, or where implied by law, but the duty arises under the law of contract, and not under tort law.

---

1984) (stating that equitable assignments are valid if supported by consideration); *Matrix Fin. Servs. v. Dean*, 655 S.E.2d 290, 294 (Ga. App. 2007) (discussing the element of consideration in assignment of claims); *Bank of Cave Spring v. Gold Kist, Inc.,* 327 S.E.2d 800, 802 (Ga. App. 1985) ("An assignment is a contract and, in order to be valid, must possess the same requisites (parties, subject matter, mutual assent, consideration) as any other contract.").

*Id.* at 576.  *Florida Power* also approved the Third District Court of Appeal's decision in *GAF Corp. v. Zack*, 445 So. 2d 350 (Fla. 3d DCA 1984), a defective products case in which the court held that "the law of torts affords no cause of action for the plaintiff . . . to recover for its purely economic losses in this case."   Ultimately, the Florida Supreme Court determined that a plaintiff is precluded from recovering for economic loss in tort.  *Florida Power* 510 So. 2d at 902.  Thus, under Florida law, tort recovery for injuries caused by a product is only available where the plaintiff can show that the product damaged other property or caused personal injury.  *Interstate Sec. Corp. v. Hayes Corp.*, 920 F.2d 769, 775 (11th Cir. 1991) (applying Florida law).   This rule is known as the "economic loss rule."

Cases subsequent to *Florida Power* have clarified that "tort damages are not available unless the plaintiff has suffered injury to property outside the scope of the contract between the parties." *id.; Jarmco, Inc. v. Polygard, Inc.,* 668 So. 2d 300, 302 (Fla. 4th DCA 1996) ("[P]urchasers of defective products are limited by law to those damages that were or could have been provided by contract between the purchaser and his immediate seller. The [economic loss rule] requires that party to make use of traditional contract remedies for redress. Correspondingly, it bars the use of tort remedies to make society as a whole pay for the failure of the purchaser to protect his own interests by bargaining for appropriate provisions in his own contract.");  *Strickland-Collins Constr. v. Barnett Bank*, 545 So. 2d 476, 477 (Fla. 2d DCA 1989) (citing *Florida Power* to hold that no tort claims are available "in the absence of personal injuries or property damages outside the contract"); *Belle Plaza Condominium Assoc. v. B.C.E. Dev., Inc.*, 543 So. 2d 239, 240-41 (Fla. 3d DCA 1989) (denying tort damages where "no damages were sought

for . . . damage to property other than the defective property itself."); *GAF Corp. v. Zack Co.*, 445 So. 2d 350, 351-52 (Fla. 3rd DCA 1984) (prohibiting tort damages because plaintiff suffered no additional property injury due to negligently manufactured and installed roofing materials).

In Florida, a pre-requisite to claiming damage to other property is that the plaintiff must be the owner of the other damaged property. *See generally Pulte Home Corp. v. Osmose Wood Preserving, Inc.,* Case No. 89-788, 1992 U.S. Dist. LEXIS 19441, at *22-23 (M.D. Fla. March 11, 1992) (applying Florida law). This requirement is consistent with the general rule that a party only has standing to bring a claim when it has personally suffered an injury. If the other damaged property is not owned by the Plaintiff, the party has not suffered an injury. Just as "[p]hysical injury to third parties is insufficient to satisfy [the personal injury] economic loss rule exception," damage to third-party's property is insufficient to satisfy the other property exception. *Turbomeca, S.A. v. French Aircraft Agency, Inc.*, 913 So. 2d 714, 716 (Fla. 3rd DCA 2005).

In determining if plaintiff has suffered damage to other property, the question is whether property other than the defective property itself, or property other than that which the defective property is an integral part of, has been damaged. *Aetna Life & Casualty Co. v. Therm-O-Disc, Inc.*, 511 So.2d 992 (Fla. 1987); *see also Casa Clara Condo v. Charley Toppino*, 558 F.2d at 633 (where plaintiffs brought a tort claim against supplier of allegedly defective concrete used in home construction, the court concluded that "the structures, the homes and the buildings, not [just] the concrete, are the 'property' for purposes of applying the economic loss doctrine."). "Losses due to repair, replacement and diminution in value

are not recoverable in tort." *Casa Clara Condo.*, 588 So.2d at 633 (citing *East River*, 476 U.S. 858 (1986)).

Pycsa claims that Count II, although it seeks purely economic damages, survives the application of the economic loss rule under the "other property exception" because the wall collapse caused damage to adjoining roadways, culverts, and to the remaining, non-defective Tensar Mesa retaining wall systems.   As discussed above, because the assignment is not valid, damage to the non-defective Mesa Wall Systems at Martin  Luther King and La Funsa bridges cannot be claimed by Pycsa.   The question thus remains whether the alleged damage to the adjoining roadways and culvert can be considered damage to other property under Florida law.

Although Pycsa has alleged that adjoining roadway and culverts were damaged, Pycsa has not submitted even a shred of evidence to demonstrate that it owned such property, nor is Pycsa seeking recovery for such alleged damage.  In fact, Oscar Delgado, testifying as Pycsa's corporate representative, stated that the government of Panama owned the project, which includes the bridges, the adjoining roadways and drainage culverts. (*See* Delgado Depo., DE 267, 78: 8-13).   As far as the cost of repairing the adjoining roadways and culvert, if any, it is undisputed that Vial was the entity that absorbed these costs.   Without a proper assignment, Pycsa cannot claim damages to Vial's other property, nor can Pycsa claim damages to the government's property.   Having produced no summary judgment evidence to support a claim that it has suffered damages to "other property" it owned, the Florida economic loss rule bars recovery under Count II.

**4.     The Conditions of Sale on Tensar's Invoices**

If Pycsa is correct in its argument that the assignment of damages is valid, Pycsa

has conceded that per the assignment it stands in the shoes of Vial as to any claim related

to the sale of the Tensar component parts.   Under this scenario, the claim must be

construe as one arising under the agreement between Tensar and Vial so that any

defenses Tensar would have been able to assert against Vial are available against

Pycsa.[36]   In this case, Vial ordered component parts from Tensar through a series of

purchase orders.   Upon receipt of the orders, Tensar shipped the goods to Vial and

followed the shipment with the mailing of an "Original Invoice" and "Remittance Copy."  (DE

330; Jan. 18, 2008 Hr'g Tr.). In the back of the invoice, Tensar printed its "Conditions of

Sale."   The following are among the terms found in the back of Tensar's invoices:

> a.   a choice-of-law clause which provides that the agreement shall be governed by the laws of the State of Georgia, and under which Vial agreed to submit to the jurisdiction of the State of Georgia;
>
> b.   an "Inspection and Condition of the Product" clause providing that "[t]he Purchaser [Vial] shall carefully examine the Product on receipt of the same and shall be [sic] telegram or telefax to be received by the Seller [Tensar] within (2 days [sic] of receipt of the Products ... If no such notice is received ... the Seller shall be discharged from all liability in respect of such defects or short, or over delivery;
>
> c.   a "limited warranty" clause, which provides that the Seller warrants that the Products supplied will be of good and workmanlike quality manufactured in accordance with applicable specifications.  This limited warranty is in lieu of all other warranties, expressed or implied by operation of law;
>
> d.   a limitation of liability under which Tensar shall not be liable in any circumstances whatsoever for loss or damage of any kind suffered to or by any third party; unless the injury relates to

---

[36] At the Jan. 18, 2008 hearing on the motion for summary judgment, Pycsa conceded this point.  (*See* Jan. 18, 2008 Hr'g Tr.).

personal injury or death arising out of Tensar's negligence. Further, Vial shall indemnify Tensar from and against all claims for damage, loss or expense of whatsoever nature by any third-party;

e.   if the Product does not conform to the provisions of the limited warranty, or if Tensar is liable as a result of the sale, handling or use of the Product, Vial's *exclusive remedy* is the repayment of the purchase price or, at the Seller's option, replacement of the non-conforming goods;

f.   finally, Tensar is not liable for any incidental or consequential damages arising from the use of its product.

(*See* DE 330). Pycsa does not dispute that these terms are printed in the back of the invoices; nor does it dispute that a valid assignment places Pycsa in the shoes of Vial and subjects it to any limitations Vial would have been subject to.  However, Pycsa argues that under Georgia law, these additional "post-sale" terms and conditions are not part of the Tensar/Vial agreement for the sale of goods.[37]   It is therefore necessary to discuss Georgia's  Uniform Commercial Code ("UCC") as it relates to additional terms and conditions in contracts between merchants.[38]

---

[37]

Pycsa also argues that the Court cannot determine the issue of whether the terms and conditions became part of the agreement without reviewing the original invoice received by Vial.  According to Pycsa, the Conditions of Sale in back of Tensar's original invoices are so faintly printed and illegible that even if said conditions would generally form part of the agreement pursuant to Georgia's UCC, in this case, they cannot.  Despite having issued an order requiring the parties to submit all invoices, Pycsa chose not to submit the original invoices, and attempted to submit them, for the first time, during oral argument on the motion for summary judgment.  While I did not accept such late submission of evidence, Pycsa included an original invoice in its courtesy copies of its supplemental pleadings following the Jan. 18, 2008 hearing.  Despite the untimely submission, I have had the opportunity to review the original invoice as received by Vial, and have determined that the Conditions of Sale are not so faintly printed that are illegible.

[38]

Pycsa does not argue that it is not a merchant under the provisions of Georgia's UCC.

85

Section 11-2-207 of Georgia's UCC, which is titled "Additional terms in acceptance or confirmation," provides that:

> (1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.
> (2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:
>> (a) The offer expressly limits acceptance to the terms of the offer;
>> (b) They materially alter it; or
>> (c) Notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

O.C.G.A. § 11-2-207. In this case, Pycsa initiated the communications by sending Tensar a total of four single-page purchase orders for the components used in the slopes and wall abutments at Martin Luther King, La Fula and La Palmita bridges. The purchase orders are the "offers." These purchase orders did not contain any terms or conditions, and did not expressly limit acceptance to the terms of the offer. (*See* Vial Purchase Order, DE 330). Tensar accepted these offers by shipping the various products and forwarding invoices containing Tensar's Conditions of Sale on the back. Vial accepted the products and did not object to the conditions. The question of their validity thus turns on whether terms printed in invoices sent at or about the same time as the shipment of the goods become part of a contract between merchants. The Northern District of Georgia has previously addressed this same question, and in doing so it held that terms and conditions printed in "invoices that were sent after shipment of the [goods]" were incorporated into the contract unless they materially altered the agreement, or the other party objected.[39]  *See*

---

[39]

In *American Signal Company*, the Court held that the terms and limitations mentioned in

86

*Am. Signal Co. v. All Am. Semiconductor of Atlanta, Inc.,* Case No. 05-2200, 2006 U.S. Dist. LEXIS 78571, *15 (N.D. Ga. Oct. 24, 2006).[40]

A contract is materially altered when the additional terms "result in surprise or hardship if incorporated without express awareness by the other party." *Dixie Aluminum Prods. Co. v. Mitsubishi Int'l Corp.*, 785 F. Supp. 157, 160 (D. Ga. 1992) (discussing the UCC Comment to section 2-207, which explains that a clause 'materially alters' the contract if results in unfair surprise). When a buyer receives multiple invoices with the seller's conditions of sale, the element of "unfair surprise" is defeated and the terms cannot be considered "material alterations" to the contract. *Am. Signal Co.,* 2006 U.S. Dist. LEXIS 78571, at *22; *Dixie Aluminum Prods. Co.,* 785 F. Supp. at 160 ("Where a party has received twenty-four invoices with a certain type of charge expressly listed, he should not be surprised if the twenty-fifth contains the same charge. . . . As a matter of law, inclusion of such a clause... was not "unfair surprise"... [and] the addition of the ... clause was not a material addition to the contract..."). Therefore, additional terms become part of an agreement where the buyer repeatedly receives the seller's conditions of sale, and consistently fails to object. *Am. Signal Co.,* 2006 U.S. Dist. LEXIS 78571, at *20-21.

In this case, Tensar accepted Pycsa's offers (i.e. the purchase orders) by shipping

---

the initial price quotation did not form part of the agreement because there was no evidence that such communication lead to the contract. The court noted that the terms and limitations were printed on the packing slip, as well as on the invoices mailed subsequent to the shipping of the products; and held that these terms became part of the agreement. Although the conditions were printed on the packing slip, the court did not limit its holding to that fact. *See Am. Signal Co.,*2006 U.S. Dist. LEXIS 78571, at **16-20.

[40]

The parties did not appeal the District Court's decision, and no subsequent cases have overturned or questioned the District Court's holding.

the goods and sending an invoice with Tensar's Conditions of Sale.  Pursuant to §
11-2-207, Official Code of Georgia, these terms form part of the agreement unless the
purchase order expressly limited acceptance to the terms of the offer, the terms materially
alter the agreement, or the purchaser objects to the terms within a reasonable time after
receipt of same.  As discussed, the purchase orders did not limit acceptance to the terms
of the offer, and Vial never objected to the additional terms.  As to whether the terms
materially altered the agreement, the parties have jointly submitted **fourteen** invoices with
Tensar's Conditions of Sale printed on the back which were received by Vial in connection
with the purchase of Tensar's component parts.  Under the facts of this case, Pycsa cannot
claim the necessary element of surprise, and the terms cannot be said to have materially
altered the agreement.  *Cf.   Am. Signal Co.,* 2006 U.S. Dist. LEXIS 78571, **21-22
("Inclusion of these Terms and Conditions for the purchases in February through May of
2004 cannot constitute unfair surprise, and thus, the additional terms disclaiming
warranties ... are not 'material alterations' to the agreement...").  Pursuant to Georgia's
UCC, therefore, the Conditions of Sale printed in the back of Tensar's invoices apply to the
sale of Tensar's component parts in this case.  *See* O.C.G.A. § 11-2-207.

Under the various terms and conditions, Tensar cannot be liable for loss or damage
to any third party, and Vial must indemnify Tensar from and against all claims for damages
by third-parties.  In addition, the "Conditions of Sale" requires that Vial carefully examine
the product shipped and inform Tensar, within two days of receipt, of any defects in the
product; failure to give notice discharges Tensar from any liability.  The "limited warranty"
provided states that the Seller warrants that the Products supplied will be of good and
workmanlike quality manufactured in accordance with applicable specifications, and that

the limited warranty is in lieu of all other warranties, expressed or implied.  Finally, under the terms of the agreement, Tensar cannot be liable for any consequential or incidental damages; and, if the Product does not conform to the provisions of the limited warranty, or if Tensar is liable as a result of the sale, handling or use of the Product, Vial's *exclusive remedy* is the repayment of the purchase price or, at the Seller's option, replacement of the non-conforming goods.

If the assignment was valid, Pycsa assumed all of Vial's responsibilities under the terms of the agreement, and is subject to the all of the warranty limitations provided by these terms.  Pursuant to these terms, Pycsa's claim fails because it failed to give Tensar notice that the goods were defective, or that the wrong parts were shipped.  Even if notice had been given, or if it was excused, Pycsa cannot recover consequential or incidental damages.  At best, if the assignment was valid, Pycsa's damages would be limited to the cost of the purchase price of the component parts, and the remaining of count II fails for the reasons discussed above.

## G.    Negligent Hiring and Negligent Supervision

Counts III and IV of the Complaint purport to set forth a claim for Negligent Hiring and Negligent Supervision.  The parties stipulate that Florida law applies to these claims, but their reasons for doing so differ.  According to Tensar, there is only a false conflict because all of the interested jurisdictions require an employer-employee relationship in order to find liability.  On the other hand, according to Pycsa, there is only a false conflict because all of the jurisdictions recognize the claims in the context of an agency relationship.  Regardless of which law applies, Pycsa's claims fail because, as it relates to the ordering and inspection of the component parts, the design of the bridges, and the

89

construction of the bridge abutments, Funsa was neither Tensar's employee nor agent as a matter of law and fact.   Therefore, none of the jurisdictions recognize a claim for negligent hiring or negligent supervision.  Because there is a false conflict in as much as the result is the same under the laws of all interested jurisdictions, Florida law applies to Counts III and IV.

## 1.    The Law of Agency

The parties did not provide sufficient expert testimony regarding Panamanian agency law.  Absent proof that foreign law differs from that of Florida, the Court is entitled to presume it is the same.  *Nicole v. Nicole-Sauri (In re Estate of Santos)*, 648 So. 2d 277, 284 (Fla. 4th DCA 1995) ("The Third District held that the trial court was correct because under a principle of choice-of-laws doctrine, absent proof that foreign law is different from the law of Florida, the court is entitled to presume it is the same.").  I will therefore assume that the Panamanian law of agency is the same as in Florida and Georgia, and, because there is a false conflict, I will apply Florida law.

Florida law recognizes both an actual and an apparent agency relationship. "Essential to the existence of an actual agency relationship is (1) acknowledgment by the principal that the agent will act for him, (2) the agent's acceptance of the undertaking, and (3) control by the principal over the actions of the agent."  *Villazon v. Prudential Health Care Plan*, 843 So. 2d 842, 853 (Fla. 2003) (citing Restat. 2d of Agency, § 1 (1957)). Florida courts apply "a three-prong test under general agency law in order to determine the existence of apparent agency: first, whether there was a representation by the principal; second, whether a third party relied on that representation; and, finally, whether the third

party changed position in reliance upon the representation and suffered detriment." *Almerico v. RLI Ins. Co.*, 716 So. 2d 774, 777 (Fla. 1998).

In this case, the clear language of the Tensar/Funsa agreements, which explicitly denies an agency relationship, establishes as a matter of law that there is no actual agency. The question thus turns as to whether Funsa was the apparent agent of Tensar in connection with the transactions at issue. Specifically, the question is whether Funsa was Tensar's apparent agent in the design and construction of the bridge abutments. As to this question, it is undisputed that Pycsa hired Vial to construct the bridges, and that under their agreement Vial was responsible for purchasing the component parts. It is also undisputed that Vial bought the component parts directly from Tensar. Thus, at least as to the sale of the components, Funsa was not acting as Tensar's agent; in fact, Funsa was not involved in the ordering or shipping of the component parts. Even accepting Pycsa's allegation that Funsa advised Vial as to what parts to order, Funsa was not doing so as Tensar's agent. On the contrary, Funsa was doing so as Vial's agent whom it had entered into a contract with for the construction of the bridge abutments. One of Funsa's duties under the contract was "to provide supervision, labor, tools, materials and equipment necessary for the proper execution of all jobs." (DE 278 at Ex. U). Therefore, as to the ordering and inspecting of the component parts, Funsa did not act as Tensar's agent since Funsa's duties arose out of the Vial/Funsa agreements, and Tensar was not a party to this contract. Similarly, Funsa was not a party to the Vial/Tensar purchase agreements.

Pycsa next claims that Funsa was Tensar's agent in as much as it designed and constructed the bridge abutments. However, it is undisputed that Tensar was not involved in the construction of the bridges. Tensar is a manufacturer of products, not Vial's

91

subcontractor.  Vial hired Funsa as *its own* subcontractor, and Funsa was responsible for the construction of the bridge.  Therefore, as to the construction of the bridge abutments and its supervision, Funsa was Vial's agent and not Tensar's.[41]

## 2.    Negligent Hiring

Count III of the Complaint is labeled "Negligent Hiring."  In it, Pycsa alleges that Tensar had a duty to select and hire a qualified and responsible agent to implement the Tensar Mesa retaining wall system (Compl. at ¶ 97). According to Pycsa, Tensar was negligent through its agent Funsa in, among other things, failing to ensure that the proper materials were shipped by Tensar, failing to ensure that the block mold matched the design plans, failing to properly backfill the retaining wall, failing to properly maintain the integrity of the blocks, failing to install the blocks without excessive shimming, and failing to account for proper drainage.  Pycsa further alleges that Tensar shall have known that its agent Funsa "was not sufficiently qualified or capable of safely implementing the Tensar Mesa

---

[41] Pycsa points to the April 16, 2003 letter faxed by Funsa in which Parajon stated that Funsa was the exclusive distributor for all Tensar products and systems in Panama, and that "Eng. Carlos Barrera of Fundaciones, S.A. is qualified to conduct the fabrication and installation of *Tensar Triton mattresses*."  (DE 292) (emphasis added). It is not known whether the Triton mattresses were installed by Barrera.  Regardless of whether they were, the installation of these mattresses is not at issue in this litigation and cannot form an apparent agency as to the installation of the Mesa Wall System.  The Triton Mattress is another one of Tensar's systems; it is not related to the Mesa Wall System.  (Parajon Depo., 90-93).  Further, the letter is dated April 16, 2003, which means the letter was sent after Vial and Funsa had entered into a contract, and after all but one of the Vial purchase orders was received by Tensar.  At the time the letter was sent, construction of the bridge abutments had begun.  Therefore, Pycsa cannot show that it relied on Tensar's representations when it hired Funsa.  *See Almerico,* 716 So. 2d at 777 (stating that to prove apparent agency, the third party must have relief on the principal's representation).

retaining wall system at issue..." (Compl. at ¶ 99); and, that Tensar's negligent hiring was the direct and proximate cause of damages suffered by Pycsa, (Compl. at ¶¶ 100-101). While Pycsa, at times, uses the words "negligent retention" in the complaint, the allegations, taken as a whole, purport to set forth a claim for negligent hiring.

In its response opposing summary judgment, Pycsa stated that it is not pursuing a negligent hiring claim, only a negligent retention claim.    As was the case with Count II, Pycsa may not amend the allegations on its complaint simply by arguing a different theory of liability in subsequent pleadings and hearings. *See Southwick Clothing Llc v. GFT (USA) Corp.,* NO. 99-10452, 2004 U.S. Dist. LEXIS 25336 (S.D.N.Y. Dec. 14, 2004) ("A complaint cannot be amended merely by raising new facts and theories in plaintiffs' opposition papers, and hence such new allegations and claims should not be considered in resolving the motion" for summary judgment.").

To bring a prima facie case for negligent hiring, Florida law requires that a plaintiff demonstrate that: "(1) the employer was required to make an appropriate investigation of the employee and failed to do so; (2) an appropriate investigation would have revealed the unsuitability of the employee for the particular duty to be performed or for employment in general; and (3) it was unreasonable for the employer to hire the employee in light of the information he knew or should have known." *Malicki v. Doe*, 814 So. 2d 347, 361-362 (Fla. 2002). A necessary predicate for a claim of negligent hiring is the existence of an employment relationship. *Behrman v. Allstate Life Ins. Co.*, 388 F. Supp. 2d 1346, 1350 (S.D. Fla. 2005), *aff'd,* 178 Fed. Appx. 862 (11th Cir. 2006).

Pycsa's claim of Negligent Hiring fails as a matter of law for several reasons.  First,

it is undisputed that there is no employment relationship between Tensar and Funsa; in fact, Vial hired Funsa as its own subcontractor in connection with the North Corridor project.  *See*  Professional Services Contract, DE 278 at Ex. U.  As Vial's subcontractor, Funsa acted as Vial's agent in connection with the construction of the bridges.  Second, even if Pycsa could establish the employment relationship, or even if, as Pycsa argues, an employment relationship is not required, there is no record evidence as to the type of investigation Tensar made of Funsa prior to entering into its business dealings with it; nor is there any evidence that an appropriate investigation would have revealed Funsa's alleged unsuitability for the duties performed.  In response to these arguments, Pycsa merely acknowledges that it is not seeking a claim for negligent hiring.[42]  Based on Pycsa's statement that it is not pursuing such a claim, and based on the complete lack of record evidence to support the necessary elements of the claim, Tensar is entitled to summary judgment as to Count III of the Complaint.

**3.    Negligent Supervision**

In Count IV, Pycsa brings a claim for negligent supervision against Tensar based on the same alleged negligent acts of Funsa.  In its claim, Pycsa alleges that as the designer and component provider of the Tensar Mesa System, Tensar had a duty to supervise Funsa and to ensure that the system was implemented properly.  (Compl., ¶

---

[42]

Pycsa also argues that it is too late to raise a technical pleading issue at this stage of the litigation, and that had Tensar raised the issue at the motion to dismiss stage, the problem could have been easily resolved.  Pycsa provides no support for its position, and my independent review of the Federal Rules of Civil Procedure and case law did not reveal any rule that requires Defendant to raise all available defenses at the motion to dismiss stage.  A defendant does not have a duty to assist the Plaintiff by informing it of all the deficiencies found in the Complaint.  Therefore, Pycsa's argument is meritless.

103).   Pycsa further claims that "Tensar, through its agent Fundaciones, was negligent in, among other things, failing to ensure that the proper materials were shipped by Tensar, failing to ensure that the block mold matched the plans, failing to properly backfill the retaining wall, failing to properly maintain the integrity of the individual blocks, failing to install the blocks without excessive shimming, failing to account for the proper drainage." (*Id.* ¶ 104).   Finally, Pycsa alleges that Tensar knew or should have known that Funsa would negligently and improperly implement the Mesa Wall System, and that Tensar's negligent supervision was the cause of Pycsa's damages. (*Id.* ¶¶ 105-107).

In Florida, negligent supervision encompasses the tort of negligent hiring and negligent supervision. *Malicki*, 814 So. 2d at 361-362.  The primary distinction between negligent hiring and negligent supervision/retention is "the time at which the employer is charged with knowledge of the employee's unfitness."  *Id.* at n. 15.  A claim for negligent hiring concerns the period of time preceding the hiring of the employee.  *Id.*  The focus in these cases is on the adequacy of the employer's pre-employment investigation into the employee's background.  *Id.*  On the other hand, in negligent supervision or retention cases, a claim which arises after employment begins, the focus is on whether the employer knows or should know of an employee's unfitness and fails to take further action such as investigating, discharge or reassignment.  *Id.*   In either case, the "core predicate for imposing liability in negligence cases is one of reasonable foreseeability -- the cornerstone of Florida tort law."  *Id.*

As with the negligent hiring claim, the negligent supervision claims as a matter of law because there is no employment relationship between Funsa and Tensar.   *Cf.*

95

*Behrman*, 388 F. Supp. 2d at 1350 ("In addition to the operation of the economic loss rule on Plaintiff's claim for negligent hiring, training, and supervision, this claim fails for another reason: Plaintiff has once again failed to allege an employer-employee relationship...") (applying Florida law).   Even if an employment relationship was not required, as to the construction of the bridge abutments, Funsa was not acting as Tensar's agent.   In actuality, Funsa contracted with Vial to provide construction and supervision services.   It was Vial, not Tensar, that had the duty to supervise Funsa.   Moreover, there is no record evidence on summary judgment to support the allegation that Tensar knew, or should have known, that Funsa was negligently implementing the Mesa Wall System.   More importantly, even if it had known, Tensar did not have the power, as a third party, to terminate the Funsa/Vial agreement.   Nor did Tensar had the power to supervise Funsa, who was neither its employee or agent.

## IV.   Order

Tensar is entitled to summary judgment as to all counts of the Complaint.   Having conducted a review of the Restatement (Second) of Conflict of Laws, Panama law applies to Counts I (strict liability) and II (products liability) of the Complaint because Panama is the only jurisdiction whose policies will be advanced by the application of its laws without contravening the policies of the other interested jurisdictions.   Moreover, as to both counts, the four relevant factors under the Restatement favor the application of Panamanian law: (1) Funsa, Pycsa and Vial are incorporated in Panama; (2) the injury occurred in Panama; (3) a significant portion of the alleged conduct causing the injuries in Count I and II occurred in Panama; and, (4) the relationship among the parties was centered, in part, in Panama.   As to Count I, summary judgment is entered because Panama did not recognize

a strict products liability cause of action at the time of the bridge collapse.  As to Count II,

Tensar is entitled to summary judgment because Tensar is a manufacturer of component

parts, and Panama law does not impose liability against the manufacturers of component

parts.  Alternatively, were I to construe count II as a claim of general negligence, Florida

law would apply as there is no true conflict among the laws of the interested jurisdictions.

Application of Florida's law results in Pycsa's claim being barred by Florida's economic

loss rule, since Pycsa is attempting to recover economic damages in tort without having

suffered personal injury or damage to other property it owns.  In addition, the assignment

of damages from Vial and Pycsa fails for lack of consideration; but, if the assignment was

valid, count II would be governed by Georgia law pursuant to the "Conditions of Sale"

printed in back of Tensar's invoices.  Under these terms and limitations, Pycsa's claim fails

because Vial did not provide the required notice that the parts shipped were defective.

Even if notice was excused, Pycsa's claim, at best, is limited to the cost of the component

parts.

As to Counts III and IV, there is no true conflict among the laws of the interested

jurisdictions and Florida's law applies.  Under Florida's law, Tensar is entitled to summary

judgment because Funsa was neither Tensar's employee nor agent as to the sale of

component parts since the orders were placed directly by Vial with Tensar.  Similarly,

Funsa was not Tensar's employee or agent as to the construction of the bridge abutments

since Vial hired Funsa as its own subcontractor to build the bridges.  For these reasons,

being fully advised and having considered the pertinent portions of the record and

applicable law, it is hereby **ORDERED and ADJUDGED**:

1.      Defendant's Motion for Summary Judgment as to all counts of the Complaint

[DE 260] is GRANTED.

2.       The Court retains jurisdiction on Tensar's Objections [DE 349] to the Special

Master's Report and Recommendations on the allocation of the Special

Master's fees, and on matters of attorneys' fees and costs.

3.       Entry of a Final Judgment is reserved pending resolution of Tensar's

Objections [DE 349].   The Objections will be addressed by separate Order.

4.       All other pending motions are DENIED AS MOOT and all other hearings are

CANCELLED.

5.       The Clerk of Court is instructed to ADMINISTRATIVELY CLOSE this case.

**DONE AND ORDERED**, in Chambers, in Miami, Florida, this 16th day of

April, 2008.


_____

**THE HONORABLE ALAN S. GOLD**
**UNITED STATES DISTRICT JUDGE**

cc:
Special Master Thomas E. Scott
United States Magistrate Judge Chris McAliley
All Counsel of Record